# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| William Lund, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| v. | ) No. 17 CV 50035 |
| | ) Magistrate Judge Iain D. Johnston |
| City of Rockford, et al., | ) |
| | ) |
|        Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Like the Dead Collector in "Monty Python and the Holy Grail" whacking the Dead Body That Claims It Isn't,[1] this order hopefully puts the self-critical analysis privilege to rest in the context of Illinois law enforcement internal investigations. In fact, the self-critical analysis privilege has been moribund since the Supreme Court's decision in *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182 (1990).

This Court refuses to recognize the self-critical analysis privilege. Even if this Court were to recognize that privilege, the Court finds that the privilege would not apply under the facts presented here.

## BACKGROUND

### Allegations in Complaint

Plaintiff's complaint contains the following allegations. A local business called Rockford Scanners maintains a website that blogs about, among other things, crime occurring in Rockford, Illinois. *See* www.rockfordscanner.com (last visited Nov. 29, 2017). As of January 2016, millions had visited the website, which had over 100,000 followers. Sometimes, Rockford Scanner contributors arrive at crime scenes before official first responders. According to the complaint, the goal is to post citizens' first-hand reports of their observations to inform the community. In theory, this would allow the community to better combat crime in Rockford.[2]

---

[1] http://www.imdb.com/title/tt0071853/quotes (last visited Nov. 29, 2017).

[2] Rockford, Illinois has a bad rap. For years, the city has found itself near the top of all the wrong lists. Certainly, the Court is aware of crime in the Rockford area. Indeed, this order was delayed due to multiple criminal matters pending before the Court. But the Forest City is also full of decent, hard-working people – some of them police officers – who care about their community. And these people are making a full-out effort to improve the

The complaint relates to the following incident ("Incident"). On May 25, 2015, Plaintiff was a freelance contributor for Rockford Scanner. That night, while in the Midtown District, Plaintiff was on a motor powered bicycle when he witnessed what he thought was police activity. In the age of the ubiquitous cell phone, Plaintiff began recording the events. At that time, two officers approached him, told him to leave, and threatened him with arrest. Plaintiff claims that as he was leaving "he said goodbye to some of the officers." He was then arrested despite committing no crime. Plaintiff claims he was charged with obstructing a peace officer, improper lane usage, operating an uninsured vehicle, and aggravated driving while license revoked. According to the complaint, two officers ordered that Plaintiff's cell phone be seized. But Plaintiff claimed he was arrested for merely recording and documenting the police activity occurring on a public street. Plaintiff also alleges that in retaliation the officers falsely informed media outlets that Plaintiff was arrested as part of a prostitution sting and provided his name and booking photo to the media. The Winnebago County State's Attorney's Office subsequently dismissed all charges against Plaintiff.

As a result of the Incident, based on these allegations, Plaintiff filed an eleven-count complaint pursuant to 42 U.S.C. §1983, containing claims based upon, among other things, the First and Fourth Amendments. The complaint names the City of Rockford ("City") and three officers as defendants ("Defendant officers").

## Facts Relating to Discovery Dispute

On March 31, 2016, Plaintiff filed a citizen complaint with the Rockford Police Department ("RPD") because of the Incident. The citizen complaint was made under oath and penalty of perjury. Dkt. #22-1.

Through a lieutenant, the RPD conducted what appears to be a thorough investigation of the Incident. The investigation resulted in a comprehensive eighty-eight-page report ("Report"). The Report was generated pursuant to RPD General Order 10.03. The General Order notes the dual purposes of internal investigations – to provide for discipline when officers violate policy as well as to clear officers when the complaint is unwarranted. Dkt. #32, p. 3 ("Investigations will be performed in a manner that will assure the community of prompt corrective action when Department members conduct themselves improperly and to protect the Rockford Police Department and its' [sic] members from unwarranted criticism pursuant to the discharge of their official duties."). The General Order makes no reference to any recommendations regarding discipline if a complaint is sustained. The investigation merely requires a determination of findings, stating whether the complaint is classified as "sustained," "not sustained," "exonerated," or "unfounded." Dkt. #32, p. 12.

---

community on a myriad of levels. Transform Rockford, directed by Mike Schablaske, is just one organization leading the effort. *See* www.transformrockford.org (last visited Nov. 29, 2017).

The Report also sheds more light on the Incident. At the time of the Incident, the RPD was conducting a prostitution sting. During this operation, two female officers were feigning to be prostitutes and approached individuals to determine if they would exchange money for sexual relations. Plaintiff rode his motorized bicycle to the area, and was recording some of the interactions with his cell phone, including photographing at least one of the female officers. The Report contains an allegation that at least one of the officers on the scene believed that Plaintiff was notifying potential "johns"[3] of the sting. One of the Defendant officers approached Plaintiff and told him that he needed to move from the area because Plaintiff was impeding an investigation. (This officer obviously knew Plaintiff because he referred to Plaintiff by his first name when ordering him to leave the area.) Plaintiff asked how far he needed to move. Eventually, Plaintiff was told he needed to be six blocks away. As he was leaving on his motorized bicycle, Plaintiff yelled "Good night, officers!" The officers believed that by doing so Plaintiff was informing potential "johns" that the two females were, in fact, police officers. Plaintiff was then stopped, arrested and had his cell phone seized.

After the Report was completed, on June 17, 2016, Plaintiff received a letter from RPD Chief of Police Dan O'Shea indicating that some of Plaintiff's complaints against the Defendant officers were sustained. Critically, the letter contains the following paragraph:

> The Office of Professional Standards performed an investigation into your allegations against these officers. I have reviewed the investigative report, all documentation related to this event, and I wish to inform you the evidence supported your allegations against Sergeant Eddie Torrance, Officer Timothy Campbell and Officer Sean Welsh [Defendant officers].

Dkt. #22-2.

According to the City, these types of letters are sent to complainants, informing them of the outcomes of the investigations. Dkt. #29-1, p. 2; Dkt. #32, p. 11. It is undisputed that the Defendant officers were disciplined as a result of the Incident.

The Report contains not only factual findings, but also conclusions as to whether the Defendant officers violated RPD policies. The City contends that "investigative reports prepared in conjunction with internal investigations of complaints of misconduct against police officers are . . . relied upon by the Chief of Police in determining whether allegations of misconduct against officers are sustained or not sustained." Dkt. #29-1, p. 2. But, like the General Order requiring the Report, the Report itself contains no recommendations as to discipline; it is silent in this regard.

---

[3] For the benefit of any reader raised in a plastic bubble, a "john" is the party paying for sex with the prostitute. *See Commonwealth v. Lafaso*, 727 N.E.2d 850, 854 (Mass. App. Ct. 2000).

The City produced to Plaintiff's counsel a redacted copy of the Report. The City redacted certain aspects of the Report, mostly the lieutenant's analysis and conclusions as to whether policy was violated. The City asserted the redacted portions are privileged under the self-critical analysis privilege.[4] The City and Defendant officers have not objected based on relevance. In fact, under Federal Rule of Civil Procedure 26, there is no doubt that the entire Report is relevant. Whether the Report or portions of it are admissible is not before this Court.

Plaintiff filed a motion to compel ("Motion") the production of the entire un-redacted Report. Dkt. #22. The City and Defendant officers responded and also provided the Court with an un-redacted copy of the Report to review *in camera*. Dkt. #24. Thereafter, the Court held a hearing on the Motion to focus on certain aspects of the dispute. Following the hearing, the parties filed supplemental briefs, with the City providing an affidavit in further support of its position. Dkt. #29, 32. The issue is now fully briefed and ripe for ruling.

## ISSUE

It is important to carefully articulate the issue in this case. The issue is whether the rationales and thought processes relating to the ultimate determination of whether RPD policy was violated, which are contained in a police department's office of professional standards internal investigative report, are protected by the self-critical analysis privilege. The City wisely does not assert the self-critical analysis privilege applies to the factual provisions of the Report or the ultimate conclusion as to whether the Defendant officers violated RPD policy.

## ANALYSIS

### Legal Principles

#### What Is The Self-Critical Analysis Privilege?

The self-critical analysis privilege protects internal and confidential performance evaluations, internal investigations records, and other documents containing an organization's self-critical analyses. *Dorato v. Smith*, 163 F. Supp. 3d 837, 891 (D. N.M. 2015). The rationale for the privilege is that disclosing these documents will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards. *Id.* The concern is that absent this type of privilege individuals and organizations will not candidly

---

[4] This Court has no beef with defense counsel asserting this privilege under these circumstances. By raising the issue, counsel are merely being zealous advocates for their clients. They are not unduly delaying discovery or raising an unreasonable issue. Indeed, the Court wishes a greater percentage of the discovery disputes before it were this type of legitimate variety rather than the unfortunately all-to-common "give-me-the-documents/I-won't-give-you-the-documents" bickering.

evaluate their compliance with regulatory or legal requirements out of fear of creating evidence that may be used against them in the future. *Craig v. Rite Aid Corp.*, No. 08 CV 2317, 2010 U.S. Dist. LEXIS 137773, *15 (M.D. Pa. Dec. 29, 2010).

### The Defendants Bear The Burden On This Motion To Compel.

The burden issue in this case is straight-forward. The City is asserting a privilege that it claims protects portions of the Report from disclosure. When a party asserts an evidentiary privilege, the burden falls on that party. *United States v. Hamilton*, 19 F.3d 350, 354 (7th Cir. 1994) (marital privilege); *see also Shaffer v. American Medical Association*, 662 F.3d 439, 446 (7th Cir. 2011) (attorney-client privilege).

Whether to recognize a privilege is a mixed question of law and fact. *Adkins v. Christie*, 488 F.3d 1324, 1327 (11th Cir. 2007); *Virmani v. Novant Health, Inc.*, 259 F.3d 284, 286-87 (4th Cir. 2001); *Carman v. McDonnell Douglas Corp.*, 114 F.3d 790, 793 n.2 (8th Cir. 1997). And driving the question of law is the general presumption against recognizing a privilege. *Jenkins v. DeKalb County*, 242 F.R.D. 652, 656 (N.D. Ga. 2007) ("there is a presumption against creating new privileges"). Privileges are distinctly exceptional and not lightly created because they are a derogation of the search for the truth. *United States v. Nixon*, 418 U.S. 683, 710 (1974); *United States v. Bryan*, 339 U.S. 323, 331 (1950). Indeed, at least two circuits require a "compelling" justification to recognize a privilege. *Pearson v. Miller*, 211 F.3d 57, 67 (3d Cir. 2000) ("only the most compelling candidates" are recognized); *In re International Horizons, Inc.*, 689 F.2d 996, 1004 (11th Cir. 1982). A party "seeking judicial recognition of new evidentiary privileges must demonstrate with a high degree of clarity and certainty that the proposed privilege will effectively advance a public good." *In re Sealed Case*, 148 F.3d 1073, 1076 (D.C. Cir. 1998). Alternatively, as one court more bluntly stated, "[f]ederal courts are loath to recognize new privileges." *Lalumera v. 2491 Corp.*, No. 12-929, 2012 U.S. Dist. LEXIS 121254, *3 (E.D. Pa. Aug. 12, 2012). None of this should be surprising. By their very nature, privileges conflict with the search for the truth. *See United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). And, after all, courts are in the business of searching for the truth.

### Federal Law Applies, But Illinois Law Is Not Ignored.

As the City and Defendant officers correctly assert, because the rule of decision in this case is governed by federal law, Federal Rule of Evidence 501 requires this Court to apply federal common law. *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923, 926 (7th Cir. 2004). Rule 501 provides the following:

> The common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege unless any of the following provides otherwise:

- the United States Constitution;
- a federal statute; or
- rules prescribed by the Supreme Court.

But in a civil case, state law governs privilege regarding a claim
or defense for which state law supplies the rule of decision.

Fed. R. Evid. 501.

And because the self-critical analysis privilege is not recognized by the United
States Constitution, federal statute or rule prescribed by the United States
Supreme Court, federal common law determines whether the privilege should be
recognized.

Despite the application of Rule 501, Illinois law is not ignored. In applying
Rule 501, federal courts can consider privilege law of the state of the federal court.
*Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir.
1981) ("This does not mean, however, that federal courts should not consider the
law of the state in which the case arrives in determining whether a privilege should
be recognized as a matter of federal law."); *Kelly v. City of San Jose*, 114 F.R.D. 653,
656 (N.D. Cal. 1987) ("None of this means, however, that federal courts should
wholly ignore state laws, or rights recognized by state governments, when analyzing
privilege issues in civil rights cases."). And Illinois has not recognized the self-
critical analysis privilege, either by statute or common law. *Harris v. One Hope
United, Inc.*, 28 N.E.3d 804, 805 (Ill. 2015). Indeed, in an opinion authored by
Justice Jack O'Malley, the Illinois Appellate Court, Second District, held in a case
involving the RPD that the self-critical analysis privilege does not exempt the
production of documents under the Illinois Freedom of Information Act. *Rockford
Police Benevolent and Protective Association v. Morrissey*, 925 N.E.2d 1205, 1211
(Ill. App. Ct. 2d Dist. 2010) ("A self-critical analysis exemption is not to be found
among the enumerated exemptions."); 5 ILCS 140/7.

## The Court Refuses to Recognize the Self-Critical Analysis Under These Facts

Having considered the requirements of Rule 501, this Court refuses to
recognize the self-critical analysis privilege. And even if this Court were to
recognize the privilege, it finds that the privilege does not apply under the facts of
this case.

### Neither Reason Nor Experience Support the Recognition of the Self-Critical Analysis Privilege.

Federal Rule of Evidence 501 directs that federal courts use both reason and
experience in determining whether to recognize a privilege. Rule 501 evidences the
desire that the law of privilege – as created by common law – not be frozen in time.
*In re Queen's University*, 820 F.3d 1287, 1294-95 (Fed. Cir. 2016) (recognizing

patent-agent privilege). But Rule 501 also evidences that an excellent reason must exist to recognize a new privilege. *In re Sealed Case*, 148 F.3d at 1076 (refusing to recognize protective-function privilege). To address these competing principles, the Seventh Circuit has articulated a balancing test to determine if a privilege should be recognized. *Memorial Hospital*, 664 F.2d at 1061-62. Under that test, the federal court should weigh the need for the truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will, in fact, protect the relationship in the factual setting of the case. *Id.*[5] This balancing test appears to address the "reason" requirement of Rule 501, but not the "experience" requirement. Because Rule 501 contains both requirements, the Court will address each and remain true to the language of the rule.

Reason Does Not Support the Recognition of the Privilege.

The determination of whether to recognize the self-critical analysis privilege should really begin and, more importantly, end with *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182 (1990). The Supreme Court's decision in *University of Pennsylvania* is the deathblow to this privilege. In that case, the United State Supreme Court unanimously refused to recognize the peer-review privilege. *University of Pennsylvania*, 493 U.S. at 189. The Court refused to recognize the privilege despite arguments that the disclosure of peer-review documents would reveal internal decision making that would chill forthright evaluations. *Id.* at 193. And, as numerous courts have recognized, the rationale for the peer-review privilege is identical to the rationale for the self-critical analysis privilege. *Lara v. Tri-State Drilling, Inc.*, 504 F. Supp. 2d 1323, 1328 (N.D. Ga. 2007); *Nilavar v. Mercy Health System – Western Ohio*, 210 F.R.D. 597, 604 n.12 (S.D. Ohio 2002). Accordingly, if the rationale fails for one, then it necessarily fails for the other. *E.B. v. New York City Board of Education*, 233 F.R.D. 289, 295 (E.D.N.Y. 2005) ("In *Univ. of Penn. v. EEOC* . . . the Supreme Court refused to recognize a privilege for peer review materials based on the same policy grounds as those underlying the self-critical analysis privilege."); Cohen, *A Guide Through the Morass of the Self-Critical Analysis Privilege*, 35 AZ Attorney 34, 38 (July 1999) ("The reasoning in *University of Pennsylvania v. EEOC* is seemingly analogous to an asserted self-critical analysis privilege."). Consequently, following *University of*

---

[5] Other courts have articulated different tests or factors to determine whether a privilege should be recognized. For example, the Fifth Circuit has relied upon "Wigmore's classic utilitarian formulation of the conditions for recognition of a testimonial privilege." *See ACLU v. Finch*, 638 F.2d 1336, 1345 (5th Cir. 1981) (identifying four factors). More recently, relying on *Jaffee v. Redmond*, 518 U.S. 1, 10-16 (1996), the Eleventh Circuit has identified a different four-factor test. *Adkins v. Christie*, 488 F.3d 1324, 1328 (11th Cir. 2007) (the needs of the public good; whether the privilege is rooted in the imperative need for confidence and trust; the evidentiary benefit of the denial of the privilege; and consensus among the states).

*Pennsylvania*, several authorities have questioned the viability of the self-critical analysis privilege. *See, e.g., Lara*, 504 F. Supp. 2d at 1326; *Abdallah v. Coca-Cola Co.*, No. 98 CV 3679, 2000 U.S. Dist. LEXIS 21025, *30 (N.D. Ga. Jan. 25, 2000) (the privilege "is of doubtful viability in light of the decision in *University of Pennsylvania*. . ."); *United States ex rel. Sanders v. Allison Engine Co.*, 196 F.R.D. 310, 313 (S.D. Ohio 2000); *Roberts v. Hunt*, 187 F.R.D. 71, 75 (W.D.N.Y. 1999); *Abbott v. Harris Publications*, No. 97 Civ. 7648, 1999 U.S. Dist. LEXIS 11410, *3-4 (S.D.N.Y. 1999) (noting that the policy considerations for peer review and self-critical analysis privilege are the same and citing *University of Pennsylvania* to reject the privilege).  This Court does more than just question the viability of the privilege; instead, it pronounces the self-critical analysis privilege dead in light of *University of Pennsylvania*.

Even if there were a way to escape the syllogism establishing that *University of Pennsylvania* destroys the self-critical analysis privilege, reason establishes at least two other bases for not recognizing the privilege.  Both bases stem from the fact that neither prong of the Seventh Circuit's balancing test weighs in favor of recognition.

First, as noted previously, the Court must balance (a) the need for truth against (b) the importance of the relationship, and then (c) consider whether the recognition of the privilege will protect the relationship.  *Shadur*, 664 F.2d at 1061-62.  In making this calculus, it is important to note the types of relationships in which communications are privileged. *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996).  These relationships include attorney-client, wife-husband, psychotherapist-patient, clergy-penitent, reporter-source and government-informer.  *Pearson v. Miller*, 211 F.3d 57, 71 (3d Cir. 2000); *Nilavar*, 210 F.R.D. at 605-06.  At the other end of the spectrum are communications made during relationships where federal courts have refused to recognize a privilege, including physician-patient, insurer-insured, probation officer-probationer and evaluation committee-academic peer.  *Pearson*, 211 F.3d at 67; *Nilavar*, 210 F.R.D. at 605-06.  Here, the communications at issue are generated in the relationship between the internal affairs/office of professional standards investigator and a police chief.[6]  That relationship is nowhere as historic or sacrosanct as the relationships where a privilege has been found.  Additionally, the public policy reasons for recognizing a privilege in communications in those relationships are far greater than the relationship at issue here.  The relationship at issue here is akin to those relationships where no privilege has been recognized.  In balancing the search for the truth on the one side and the desire to protect this relationship on the other side, the Court finds that the former outweighs the latter.

---

[6] The relationship at issue here is not between the internal investigator and the officer.  No privilege exists as to statements made in that context, except when the concerns at play in *Garrity v. New Jersey*, 385 U.S. 493 (1967) or the Uniform Peace Officers' Disciplinary Act, 50 ILCS 725/1 *et seq.*, exist.  If the requisite warnings are provided and their protections are complied with, then those Fifth Amendment privileges evaporate.  As a result, in that situation, an officer must speak – and speak truthfully – knowing that the communications will be shared with others.

Second, the other prong of the Seventh Circuit's balancing test in *Shadur* applies the same analysis but considers the policy reasons behind the asserted privilege rather than the relationship at issue. *Shadur*, 664 F.2d at 1061-62. An example of this type of privilege is the law enforcement investigative privilege. *See, e.g., In re Department of Investigation*, 856 F.2d 481, 485 (2d Cir. 1988); *In re Marriage of Daniels*, 607 N.E.2d 1259, 1264-65 (1st Dist. 1992). This analysis is a closer fit for the self-critical analysis privilege. But, again, the balance weighs against the privilege, in large part, because the policy consideration in this context is based on a false premise.

The only issue is whether the communications containing the analysis and mental impressions of the internal investigator to the RPD Chief of Police are privileged. And again, the purpose of the investigation is to determine if RPD policy was violated, and if so, whether discipline should be imposed as a result of that violation. The entire rationale of the self-critical analysis privilege is that if these internal communications are not protected from disclosure, the investigator will not be forthright.[7] According to that rationale, without the privilege, the internal investigator and RPD Chief of Police would be forced to make a Hobson's choice; namely, they would be forced to either (1) aggressively investigate and engage in honest dialogue regarding the investigation and risk that their actions and words may later be used in a civil rights lawsuit, or (2) perform a superficial investigation to guard against unearthing evidence that could be used in a civil rights lawsuit. *See Reichhold Chemicals, Inc. v. Textron, Inc.*, 157 F.R.D. 522, 524 (N.D. Fla. 1994). But there is no Hobson's choice to be made. The investigation and its consequences are binary: Either (a) a violation is found and discipline is imposed or (b) a violation is not found and discipline is not imposed.

If the internal investigator believes that a violation occurred and discipline should be imposed, the investigator will have every incentive to fully explain the belief to the RPD Chief of Police, otherwise discipline will be unlikely. (Why would a chief of police impose discipline based upon faulty reasoning? It is both in the investigator's and the chief's best interest to have a thorough and forthright analysis supporting the finding. Disciplining peace officers is difficult, and the process is even more difficult if the analysis of an internal investigation is suspect.)

In contrast, if the investigator (for whatever reason, either appropriately or because of a "code of silence") does not want the officer to be disciplined, the investigator will simply find that no violation of policy occurred. In making that finding, the investigator will clear the officer, and as a result, will not create a document that may someday be used against the officer.

---

[7] This belief is a horribly pessimistic view of police internal investigators, and is contrary to the undersigned's personal experience with a number of officers who conducted thorough and professional internal investigations for their departments regardless of whether the entire investigation was ultimately made public. Having reviewed the Report, it seems that the author of the Report would have been just as forthright in his conclusion even if he knew the Report would ultimately be disclosed in subsequent civil litigation.

As a result, there is no Hobson's choice to make. Either the investigator will be forthright and honest in the hopes that discipline will be imposed or the investigator will find no violation. The investigator is all in, one way or the other. There is simply no reason for an investigator to land in the middle of the road; namely, finding that a violation occurred but not supporting that finding with a thorough and forthright analysis. Such a document would be internally inconsistent and work at cross purposes.

Consequently, because the rationale for the policy is inapplicable in these circumstances, the policy itself cannot outweigh the need for the truth. As a result, the balance weighs against recognizing the privilege.

Experience Does Not Support the Recognition of the Privilege.

The self-critical analysis privilege has a spotty history at best. *Lara*, 504 F. Supp. 2d at 1326 ("The history and application of the self-critical analysis privilege, however, are anything but clear. Not only has the application of the privilege been rare, but many courts disagree over the extent to which the privilege should apply and whether any such privilege even exists."); *Tice v. American Airlines*, 192 F.R.D. 270, 272 (N.D. Ill. 2000) ("The parameters of the privilege, like the existence of the privilege itself, are rather vague."); Jones, *Behind the Shield? Law Enforcement Agencies and the Self-Critical Analysis Privilege*, 60 Wash. & Lee L. Rev. 1609, 1624 (Fall 2003) ("Application of the self-critical analysis privilege is 'problematic,' 'confusing and analytically incoherent,' 'murky,' 'unsettled,' 'largely undefined,' surrounded by 'uncertainty,' 'a morass,' and is 'inconsistent' in its application."); Bacon, *The Privilege of Self-Critical Analysis: Encouraging Recognition of the Misunderstood Privilege*, 8 Kan. J.L. & Pub. Policy 221, 228-29 (Winter 1999) ("[T]he privilege often falls under severe scrutiny, resulting in the fact that most courts fail to (or at least are reluctant to) recognize it."). The self-critical analysis privilege was not recognized at common law. *Zoom Imaging, L.P. v. St. Luke's Hosp. & Health Network*, 513 F. Supp. 2d 411, 413 (E.D. Pa. 2007). Many courts have refused to recognize the privilege. *See Craig*, 2010 U.S. Dist. LEXIS 137773 at *16 (enumerating the courts that have not recognized the privilege). Even attempts to codify the privilege through legislation have kicked around for nearly two decades without much success. *Cf.* Cohen, *A Guide Through the Morass of the Self-Critical Analysis Privilege*, 35 AZ Attorney 34, 38 (July 1999) ("Such legislation has been drafted. Several proposals have been considered by various committees of the American Bar Association. Professor David Leonard has proposed a Model Statute of the self-critical analysis privilege."); Zick, *Reporting Substantial Product Safety Hazards Under the Consumer Product Safety Act: The Products Liability Interface*, 80 Geo. L. J. 387, 401 n. 65 (December 1991) citing Allen & Hazelwood, *Preserving the Confidentiality of Internal Corporate Investigations*, 12 J. Corp. L. 355, 381 (1987) ("Those persons interested in furthering the development of the [self-critical analysis privilege] should consider asking Congress to provide for statutes in specific areas.").

General Case Law Experience

The source of the privilege appears to be *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C. 1970). *Johnson v. United Parcel Service, Inc.*, 206 F.R.D. 686, 688 (M.D. Fla. 2002). But *Bredice* more specifically involves a medical peer-review privilege. *Bredice*, 50 F.R.D. at 251. Moreover, its analysis is thin, and merely cites a single authority for recognizing the privilege. *See Jenkins v. DeKalb County*, 242 F.R.D. 652, 660 (N.D. Ga. 2007). Additionally, the decision has been rejected and criticized. *Hilavar v. Mercy Health Systems*, 210 F.R.D. 597, 603, 609 (S.D. Ohio 2002) (noting that *Bredice* was decided before adoption of Rule 501 and failed to critically examine the federal common law); *Syposs v. United States*, 179 F.R.D. 406, 410 (W.D.N.Y. 1998).

Since *Bredice*, the self-critical analysis privilege has been recognized or not recognized in different courts and in different contexts. But most federal courts have declined to apply the privilege, although many have been ambiguous as to whether they recognize it. *Dorato*, 163 F. Supp. 3d at 892; *Abdallah v. Coca-Cola Co.*, 98 CV 3679, 2000 U.S. Dist. LEXIS 21025, *18 (N.D. Ga. Jan. 25, 2000) ("This Court has reviewed decisions by federal courts across the country and finds that while the self-critical analysis privilege has been applied by some courts, it has been rejected by many others, and it is neither widely recognized nor firmly established in federal common law."). "Uncertainty about the self-critical analysis privilege exists nationwide." Cohen, *A Guide Through the Morass of the Self-Critical Analysis Privilege*, 35 AZ Attorney at 37. But, since at least 1990, the trend is against recognizing the privilege. *Johnson*, 206 F.R.D. at 690 ("federal district courts are moving away from earlier decisions embracing the privilege, and the district courts which have most carefully considered the issue have almost unanimously concluded that the privilege should not be recognized or that it should be recognized only on a very limited basis"). The trend after 1990 should not be surprising. *University of Pennsylvania* was decided in 1990.

A survey of the circuit courts and district courts establishes that no circuit court of appeals has recognized the self-critical analysis privilege and the district courts within the circuits have not consistently, let alone uniformly, recognized the privilege. (The Court has attempted to be careful in its description of the case law. "Recognize" means that a court has affirmatively decided that it will adopt the privilege as common law under Rule 501. "Apply" means that the court bypassed the Rule 501 analysis and assumed – explicitly or implicitly – that the privilege was recognized and decided the issue based on that assumption.)

- The First Circuit has not been presented with the issue of whether to recognize the privilege. But at least one district court seems to have applied

the privilege to protect documents from disclosure. *See O'Connor v. Chrysler Corp.*, 86 F.R.D. 211, 217 (D. Mass. 1980).

- The Second Circuit has not been presented with the issue of whether to recognize the privilege. As a result, the district courts in the Second Circuit have repeatedly noted that the Second Circuit has not recognized the privilege. *MacNamara v. City of New York*, No. 04 Civ. 9216, 2007 U.S. Dist. LEXIS 17478, *9 (S.D.N.Y. Mar. 14, 2007). The district courts in the Second Circuit have routinely refused to apply the privilege to shield documents from production. *See, e.g., Bailey v. City of New York*, No. 14 Civ. 2091, 2015 U.S. Dist. LEXIS 97871, *17 (E.D.N.Y. July 27, 2015); *E.B. v. New York City Board of Education*, 233 F.R.D. 289, 295 (E.D.N.Y. 2005) ("Many courts in this Circuit have flatly rejected it, and this Court finds those decisions persuasive.").

- The Third Circuit refused to recognize the privilege. *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 351 n.12 (3d Cir. 2009) (stating that the privilege "has never been recognized by this Court and we see no reason to recognize it now."). And the district courts in the Third Circuit routinely reject the privilege to shield documents and communications. *Craig*, 2010 U.S. Dist. LEXIS 137773 at *15-16 (collecting cases).

- The Fourth Circuit refused to recognize the privilege for documents prepared for external use. *Reynolds Metals Co. v. Rumsfeld*, 564 F.2d 663, 667 (4th Cir. 1977).

- The Fifth Circuit did not decide whether it should recognize the privilege, but instead refused to apply the privilege under the facts presented. *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000).

- The Sixth Circuit has not been presented with the issue of whether to recognize the privilege. At least one district court has refused to recognize the privilege. *See Levans v. St. Francis Hospital – Bartlett, Inc.*, No. 15-CV-2142, 2015 U.S. Dist. LEXIS 178853, *8 (W.D. Tenn. Sept. 18, 2015) (refusing to recognize the privilege). And other district courts doubt that the Sixth Circuit would recognize the privilege. *Cochran v. National Processing Co.*, No. 09-364, 2010 U.S. Dist. LEXIS 19943, *6-8 (E.D. Ky. Mar. 10, 2010).

- The Eighth Circuit found that a district court did not abuse its discretion in refusing to admit evidence over the privilege objection in *LeClair v. City of St. Paul*, 187 F.3d 824, 828-29 (8th Cir. 1999). But the district courts in the Eighth Circuit have apparently not read *LeClair* as recognizing the privilege. *See, e.g., Stacy v. PPC Transportation Co.*, No. 11 CV 4018, 2013 U.S. Dist. LEXIS 195988, *4 (W.D. Ark. Feb. 22, 2013) ("[T]he Eight Circuit has not recognized this privilege."); *In re Guidant Defibrillators Products Liability Litigation*, No. 05-1708, 2006 U.S. Dist. LEXIS 14752, *5-6 (D. Minn. Mar. 16, 2006) (in refusing to apply the privilege, the court stated, "The Court does not have to reach the issue of whether the Eighth Circuit or the District of Minnesota have recognized, to date, any self-critical analysis privilege. There is clearly a disinclination of the courts toward such evidentiary privileges.").

- The Ninth Circuit refused to apply the privilege for documents relating to routine corporate reviews and has refused to recognize the privilege. *Dowling v. America Hawaii Cruises, Inc.*, 971 F.2d 423, 427 (9th Cir. 1992); *see also Union Pacific Railroad Co. v. Mower*, 219 F.3d 1069, 1076 n.7 (9th Cir. 2000) (referring to the privilege as "novel" and noting that it had not recognized the privilege).

- The Tenth Circuit has not been presented with the issue of whether to recognize the privilege. And precedent in that circuit casts serious doubt on whether it would recognize the privilege. *See In re Quest Communications International, Inc.*, 450 F. 3d 1179, 1199 (10th Cir. 2006) ("In this case, there is no grounds to buck the trend of declining to create a new privilege. There is no groundswell in the state legislatures for a privilege for materials produced in a government investigation."). But in different contexts, different district courts have both recognized and not recognized the privilege. *Compare Dorato*, 163 F. Supp. 3d at 892 (refusing to recognize the privilege in context of police internal investigative files) *with Weekoty v. United States*, 30 F. Supp. 2d 1343, 1347-48 (D. N.M. 1998) (recognizing privilege in tort case involving morbidity and mortality conferences).

- The Eleventh Circuit has not been presented with the issue of whether to recognize the privilege. Although some district courts in the Eleventh Circuit have recognized the privilege, more recent cases have refused to recognize it. *See Lara*, 504 F. Supp. 2d at 1326; *Johnson*, 206 F.R.D. at 691-93.

- And the District of Columbia, where the privilege started with *Bredice*, has shown a reluctance to recognize the privilege. *First Eastern Corp. v. Main Waring*, 21 F.3d 465, 471 n.1 (D.C. Cir. 1994) (noting that it was unlikely to fashion a privilege lacking historical or statutory basis); *FTC v. TRW*, 628 F.2d 207, 210 (D.C. Cir. 1980) (noting that courts were reluctant to "enforce" the privilege); *Wade v. Washington Metropolitan Area Transit Authority*, No. 01-2385, 2006 U.S. Dist. LEXIS 16447, *16 (D. D.C. Apr. 5, 2006) (stating that the privilege was "rarely recognized").

In the Seventh Circuit, the case law is all over the lot. Initially, it is important to note that the Seventh Circuit, itself, has not recognized the self-critical analysis privilege. *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985).[8] As far as district

---

[8] The court in *Scott v. City of Peoria*, 280 F.R.D. 419, 423-24 (C.D. Ill. 2011) stated the following: "There can be no doubt that this privilege exists; that was, after all what the Seventh Circuit stated in *Coates*, 756 F.2d at 551." The *Scott* court then went on to recognize the privilege, but found that the police department's internal affairs investigative documents were not protected by the privilege. *Scott*, 280 F.R.D. at 427. The *Scott* decision should *not* be read to say that the Seventh Circuit *recognized* the self-critical analysis privilege in *Coates*; *Coates* did not. *Scott* can only be read for the proposition that the Seventh Circuit stated that other courts in the context of challenges to affirmative action programs had recognized the privilege. In both *Coates* and *Burden-Meeks* – the only two

court decisions are concerned, whether the privilege is recognized in the Seventh Circuit depends, to paraphrase Frank Sinatra, on where or when (and in what context).[9]

- ❖ Wisconsin

  - In 1972, the Eastern District of Wisconsin, in a civil rights case, refused to apply the privilege in the context of police department internal affairs reports. *Wood v. Breier*, 54 F.R.D. 7, 13 (E.D. Wisc. 1972).

  - In 2007, the Western District of Wisconsin, in an employment discrimination case, refused to recognize the privilege in the context of documents sought by the Equal Employment Opportunity Commission. *EEOC v. City of Madison*, No. 07 C 349, 2007 U.S. Dist. LEXIS 70647, *2 (W.D. Wisc. Sept. 20, 2007).

- ❖ Indiana

  - In 1985, the Northern District of Indiana, Judge Lee, in a product liability case, without engaging in a Rule 501 analysis, found that portions of a document submitted to the Consumer Products Safety Commission were protected by the privilege. *Roberts v. Carrier Corp.*, 107 F.R.D. 678, 684 (N.D. Ind. 1985).

  - However, in 2016, in the Northern District of Indiana, Magistrate Judge Martin, in a wrongful death case, refused to recognize the privilege. *Rogers v. Quality Carriers, Inc.*, No. 15 CV 22, 2016 U.S. Dist. LEXIS 80868, *14 (N.D. Ind. June 21, 2016). This case did not discuss or cite the *Roberts* decision.

  - The Court has been unable to locate any case from the Southern District of Indiana addressing the self-critical analysis privilege.

- ❖ Illinois

---

times the Seventh Circuit has addressed the privilege – the Court never *recognized* the privilege. In *Coates*, the Seventh Circuit specifically stated that it was not deciding if the privilege existed: "We need not decide, however, whether the district court's order denying the pretrial discovery of defendants' self-critical evaluations was proper in this case. . ." *Coates*, 756 F.2d at 551. And the Seventh Circuit was even blunter in *Burden-Meeks* when it referred to the self-critical analysis privilege as "a privilege never recognized in this circuit." *Burden-Meeks*, 319 F.3d at 899.

[9] www.youtube.com/watch?v=KX3xfjnBzic (last visited Nov. 29, 2017).

- In 2010, the Southern District of Illinois, in a Federal Tort Claims Act case, the court "declined [the] opportunity to expand the federal common law" and refused to recognize the privilege. *Buechel v. United States*, No. 08-132, 2010 U.S. Dist. LEXIS 85176, *8 (S.D. Ill. Aug. 19, 2010).

- In 2011, the Central District of Illinois, in a civil rights case, the court applied the privilege, but found that the police department's internal affairs documents were not privileged. *Scott v. City of Peoria*, 280 F.R.D. 419, 424, 427 (C.D. Ill. 2011).

- The Northern District of Illinois decisions are varied. Attempting to reconcile the decisions is a headache-inducing exercise.

  - In 1982, in an employment discrimination case, Judge Shadur noted the requirements of the privilege, but specifically decided not to determine "whether to embrace" the privilege. *Resnick v. American Dental Ass'n*, 95 F.R.D. 372, 374 (N.D. Ill. 1982).

  - In 1992, in a Title VII gender discrimination case, Judge Hart applied the privilege, but found that the privilege was not applicable and ordered the defendant to respond to the discovery request. *Vanek v. Nutrasweet Co.*, No. 92 C 115, 1992 U.S. Dist. LEXIS 8191, *8-9 (N.D. Ill. June 11, 1992).

  - In 1993, Magistrate Judge Bobrick noted that other district courts side-stepped the issue of recognizing the privilege and did likewise. *Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 304-05 (N.D. Ill. 1993).

  - In 1998, in a Federal Employers Liability Act case, then-District Judge Williams assumed the privilege existed, specifically found that the factors courts should consider when applying the privilege differed depending on the type of claim, and found that the privilege did not apply to the internal investigative documents. *Morgan v. Union Pacific R.R.*, 182 F.R.D. 261, 264-66 (N.D. Ill. 1998).

  - In 2000, in an employment discrimination case in which safety records were sought, Magistrate Judge Keys applied the privilege and determined that the documents were privileged. *Tice*, 192 F.R.D. at 273.

  - In 2004, Judge Zagel issued two seemingly conflicting decisions regarding the privilege. In *Robbins v. Provena St. Joseph Medical*

15

*Center*, No. 03 C 1371, 2004 U.S. Dist. LEXIS 3878, *4-6 (N.D. Ill. Mar. 11, 2004), involving an employment claim for retaliation, Judge Zagel simply applied the privilege and then determined that the documents were protected by the privilege. However, eight months later, in a different case, Judge Zagel noted the hesitancy of courts to recognize the privilege. *Ludwig v. Pilkington North America, Inc.*, 03 C 1086, 2004 U.S. Dist. LEXIS 16049, *4 (N.D. Ill. Aug. 13, 2004). ("[C]ourts have been somewhat hesitant to embrace the privilege. . . "). Judge Zagel also noted the common phenomena of courts simply assuming the privilege existed but then applying factors so rigid as to not protect the documents. *Id.* at *5 ("The majority of courts that ultimately concede or assume the privilege exists have narrowed the privilege's scope so that it does not apply to the documents at issue in the individual case."). Judge Zagel then took the same approach: He assumed the privilege existed, but found that the documents were not privileged. *Id.* at *8. The *Ludwig* decision does not seek to reconcile or harmonize its conclusion with the *Robbins* decision.

♦ In 2010, in a Fair Labor Standards Act case, Judge St. Eve declined to recognize the privilege, finding that the courts rejecting the privilege were more persuasive. *Camilotes v. Resurrection Healthcare*, No. 10 C 366, 2010 U.S. Dist. LEXIS 80741, *6-7 (N.D. Ill. Aug. 9, 2010).

Police Internal Investigations Case Law Experience

In the context of internal affairs/office of professional standards investigations, the case law conflicts to some extent. Jones, *Behind the Shield? Law Enforcement Agencies and the Self-Critical Analysis Privilege*, 60 Wash. & Lee L. Rev. at 1652 ("Application of the self-critical analysis privilege in the law enforcement context remains a troublesome and uncertain prospect."). Some pre-*University of Pennsylvania* cases support withholding these types of documents pursuant to a privilege. This Court located two cases that assumed the privilege existed and shielded the documents. *Brown v. Thompson*, 430 F.2d 1214 (5th Cir. 1970); *Kott v. Perini*, 283 F. Supp. 1 (N.D. Ohio 1968).[10] But these cases provided

---

[10] *See also* Jones, *Behind the Shield? Law Enforcement Agencies and the Self-Critical Analysis Privilege*, 60 Wash. & Lee L. Rev. at 1625-26 (citing *Cruz v. Board of Supervisors*, 1993 U.S. App. LEXIS 187 (4th Cir. Jan. 7, 1993)); *Denver Policemen's Protective Ass'n v. Lichtenstein*, 660 F.2d 432 (10th Cir. 1981). But *Cruz* failed to address *Reynolds Metals Co.* in which the Fourth Circuit rejected the privilege. Additionally, *Cruz* is also a 1993 non-precedential decision before the enactment of Federal Rule of Appellate Procedure 32.1. Moreover, *Lichtenstein*, espoused the rationale for rejecting the privilege when it stated the following: "Moreover, it is doubtful that citizens and police officers will absolutely refuse to

little, if any, authority and analysis to support their recognition of the privilege, and they have been questioned and criticized. *United States v. O'Neill*, 619 F.2d 222, 230 n.4 (3d Cir. 1980) (limiting holding of *Brown*); *Soto v. City of Concord*, 162 F.R.D. 603, 611-12 (N.D. Cal. 1995) (noting *Kott* was "heavily criticized"); *Kelly v. City of San Jose*, 114 F.R.D. 653, 664 (N.D. Cal. 1987) (criticizing *Kott*); *Boyd v. Gullett,* 64 F.R.D. 169, 178 (D. Md. 1974) (questioning and criticizing both *Brown* and *Kott*).

But the weight of the case law, in particular both recent case law as well as case law from Illinois district courts, establishes that attempts to shield police internal investigative documents by invoking the privilege ultimately fail. For example, in *Dorato*, 163 F. Supp. 3d at 892, the court specifically refused to recognize the self-critical analysis privilege to prevent the disclosure of police internal investigative documents. Like most cases addressing these types of documents, the court in *Dorato* went on to determine that even if the privilege were to exist, the documents would need to be disclosed. *Id.* Indeed, the case law overwhelming follows this pattern. *Bailey v. City of New York*, No. 14 Civ. 2091, 2015 U.S. Dist. LEXIS 97871, *17 (E.D.N.Y. July 27, 2015) ("This Court need not resolve whether to recognize the self-critical analysis in this case because, assuming arguendo that the privilege could apply, Defendants have nonetheless failed to demonstrate that 'the information is of the type whose flow would be curtailed if the discovery were allowed.'"); *Scott*, 280 F.R.D. at 427; *MacNamara v. City of New York*, 04 Civ. 9216, 2007 U.S. Dist. LEXIS 17478, *17 (S.D.N.Y. Mar. 14, 2007) ("Like other courts, I am 'doubtful [the self-critical analysis privilege] should be recognized at all.' . . . In any case, it is inapplicable here."); *Hobley v. Burge*, No. 03 C 3678, 2006 U.S. Dist. LEXIS 37229, *8 (N.D. Ill. May 24, 2006) ("Assuming, as other courts have, that there is a self-critical analysis privilege, the City here has not demonstrated that the policies giving rise to that privilege require that the Audit be kept confidential."); *Wiggins v. Burge*, 173 F.R.D. 226, 229-30 (N.D. Ill. 1997); *Soto v. City of Concord*, 162 F.R.D. 603, 611 (N.D. Cal. 1995) ("Some district courts that have recognized this privilege have held that the self-critical analysis privilege should not be applied to police personnel files and records of internal affairs investigations in civil rights suites against police officers."); *Kelly v. City of San Jose*, 114 F.R.D. 653, 664-66 (N.D. Cal. 1987); *Wood v. Breier*, 54 F.R.D. 7, 13 (E.D. Wisc. 1972) ("The danger of doing harm to the Milwaukee Police Department by allowing discovery of this file is not nearly so great as the harm that would surely result to the efficacy of our entire legal structure, including the Milwaukee Police Department, if a case such as this were won because the truth was hidden."). In all these cases, regardless of whether the courts recognized the privilege, they required that the documents be produced despite the invocation of the self-critical analysis privilege. That experience – spanning decades and courts from coast to coast – is telling.

---

cooperate in investigations because of a few isolated instances of disclosure. . . The argument that governmental processes would be frustrated has been rejected by the Supreme Court in *United States v. Nixon*. . ."); *Lichetenstein*, 660 F.2d at 437.

## Congressional Experience

Finally, in considering the experience component of Rule 501, federal courts can consider congressional action or inaction regarding a privilege. *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005). If Congress statutorily enacts a privilege, then there is no need to apply Rule 501; the privilege would exist. But if Congress refuses to statutorily enact a privilege after having considered it, then federal courts should be reluctant to recognize the privilege through common law. *University of Pennsylvania v. EEOC*, 493 U.S. at 189. Congress has not generally recognized the self-critical analysis privilege. *Zoom Imaging*, 513 F. Supp. 2d at 413. Congress has, however, statutorily recognized the self-critical analysis in very narrow contexts. *See* Bacon, *The Privilege of Self-Critical Analysis: Encouraging Recognition of the Misunderstood Privilege*, 8 Kan. J.L. & Pub. Policy 221, 228-29 (Winter 1999) (identifying various congressional attempts to recognize the privilege); NTSB Bar Association, Select Committee on Aviation Public Policy, *Aviation Professionals and the Threat of Criminal Liability – How Do We Maximize Aviation Safety*, 67 J. Air L. & Com. 875, 879 n.11 (Summer 2002) ("As the ATA recommended at the House subcommittee hearing in July, 2000, Congress should expand the protection of voluntary reporting programs by enacting a 'self-critical analysis' privilege."); *see also U.S. ex rel. Falsetti v. Southern Bell Telephone*, 915 F. Supp. 308, 313 (N.D. Fla. 1996) (Congress appears to be aware of the policy behind the privilege). But Congress has failed to recognize the self-critical analysis privilege in police misconduct cases specifically or civil rights cases generally. And, in the past, when Congress perceives abuse of the civil rights statutes, it has not been shy to act. *See, e.g.,* 42 U.S.C. §1997e (Prison Litigation Reform Act); Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309, 110 Stat. 3847, 3853. (amending and limiting availabilities for attorneys' fees and injunctive relief in suits against state judiciary).

\*　　\*　　\*

The reasoning behind and experience with the self-critical analysis privilege provides very little basis to overcome the strong disinclination to recognize a privilege that would shield relevant information from not only a litigant but also the ultimate trier of fact. *Nilavar*, 210 F.R.D. at 606 ("While the law of privilege is not static, it is reasonable to believe that new privileges should nevertheless have a certain universal appeal to them."). Indeed, both reasoning and experience strongly counsel against recognizing the privilege. This is particularly true in Illinois, where the Supreme Court has specifically and emphatically refused to recognize the privilege and the General Assembly has failed to enact the privilege after the Supreme Court's rejection of it. Also compelling is the long line of unbroken district court opinions that have refused to shield internal police investigative documents and communications from disclosure.

Reasoning does not support recognizing the self-critical analysis privilege. Initially, if the peer-review privilege was not recognized and that privilege is based on the same rationale as the self-critical analysis privilege, then the self-critical analysis privilege should not be recognized either. Additionally, the relationship sought to be protected by the privilege does not outweigh the need for the truth. Moreover, the policy reasons behind the self-critical analysis likewise do not outweigh the need for the truth. Essentially, balancing the competing interest does not support recognizing the privilege.

Experience counsels against recognizing the self-critical analysis privilege. First, the privilege has not been recognized by the Seventh Circuit when twice been given the opportunity to do so. Second, other circuit courts have likewise not recognized the privilege, and despite being recognized by district courts in various other circuits, the trend and weight of authority is against its recognition. Indeed, in contexts outside of police internal investigations, the district courts that have given the most thoughtful and complete analyses consistently refuse to recognize the privilege. *See Johnson*, 206 F.R.D. at 690; *Abdallah*, 2000 U.S. Dist. LEXIS 21025 at *18. This is particularly true with more recent cases. *See Craig*, 2010 U.S. Dist. LEXIS 137773 at *16. And more specifically, in the context of cases addressing the privilege as it relates to police internal investigations, the courts have consistently refused to shield the documents from disclosure. *See Dorato*, 163 F. Supp. 3d at 892; *Bailey,* 2015 U.S. Dist. LEXIS 97871 at *17. Third, Congress appears well aware of the privilege and proponents of the privilege have advocated the need for enacting the privilege, yet Congress has not generally adopted the privilege or adopted it specifically in the context of civil rights cases. Fourth, the Typhoid Mary of the self-critical analysis privilege – *Bredice* – is based on weak authority and reasoning, and predates both Rule 501 and *University of Pennsylvania*. In short, the self-critical analysis lacks a solid historical basis. *See Levans*, 2015 U.S. Dist. LEXIS 178853 at *8.

In large part, the City and Defendant officers rely upon two decisions: *Gardner v. Johnson*, No. 08 CV 50006, 2008 U.S. Dist. LEXIS 61707 (N.D. Ill., Aug. 13, 2008) and *DeLuna v. City of Rockford*, No. 00 CV 50040. These decisions were made by now retired Magistrate Judge P. Michael Mahoney.[11] But these decisions do not control the outcome in this case for two reasons. First, these decisions are not binding, particularly *DeLuna*, which was a minute entry. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (district court opinions are not binding); *Davis v. Cash for Payday, Inc.*, 193 F.R.D. 518, 525 (N.D. Ill. 2000) (minute orders have limited precedential value).

---

[11] Before retiring, Judge Mahoney was the one and only magistrate judge in the Western Division for over 35 years. So the City's and Defendant officers' reliance on these decisions is not surprising. Indeed, Judge Mahoney is a legal legend in these parts. For example, the local chapter of the Federal Bar Association bears his name. Likewise, the mediation center on the fifth floor of the Stanley J. Roszkowski United States Courthouse is named after him. And Judge Mahoney's skills as a mediator are highly sought-after to this day.

Second, these decisions are distinguishable. Initially, in *DeLuna*, Judge Mahoney specifically found that the information withheld pursuant to the self-critical analysis privilege was not relevant. Having reviewed the entire, un-redacted Report *in camera*, this Court concludes that the information is relevant. Moreover, in *DeLuna*, the purpose of the documents being withheld was very different. In that case, Judge Mahoney specifically noted that the purpose of the documents was "not to recommend disciplinary measures." In contrast, in this case, the City and Defendant officers specifically state that the Report was used by the RPD Chief of Police to determine whether to impose discipline. Dkt. #29-1, p. 2. In *Gardner*, Judge Mahoney assumed that the privilege existed, but found that the privilege was waived. *Gardner*, 2008 U.S. Dist. LEXIS 61707 at *4. Finally, in proving that context matters in determining whether to recognize the privilege and if so, to what extent, Judge Mahoney consistently found that the privilege did *not* apply in the context of affirmative action plans. *Bell v. Woodward Governor Co.*, No. 03 C 50190, 2004 U.S. Dist. LEXIS 1052, *6 (N.D. Ill. Jan. 26, 2004). Accordingly, Judge Mahoney never gave a full endorsement of the privilege. The distinguishable and non-precedential decisions in *Gardner* and *DeLuna* are simply insufficient to overcome the reasoning and experience supporting this Court's refusal to recognize the privilege.

### Even if This Court Were to Recognize the Privilege, it Finds that the Privilege Would Not Apply Under the Facts of This Case

Even if this Court were to recognize the privilege as a general matter, the Court would not apply the privilege to the Report in this case.

Courts have developed a four-factor test to determine if the communications at issue are privileged. Those factors require the party asserting the privilege to show the following: (1) the information sought resulted from a critical self-analysis undertaken by the party seeking protection; (2) the public has a strong interest in preserving the free flow of the type of information sought; (3) the information is of the type whose flow would be curtailed if the discovery were allowed; and (4) whether the document was prepared with the expectation that it would be kept confidential and has, in fact, been kept confidential. *Scott*, 280 F.R.D. at 425; *MacNamara*, 2007 U.S. Dist. LEXIS 17478 at *9-10; *Hobley v. Burge*, 2006 U.S. Dist. LEXIS 37229 at *8; *see also Bailey*, 2015 U.S. Dist. LEXIS 97871 at *17. Every case to have applied this four-factor test to police internal investigation documents has held that the communications are not privileged. *Scott*, 280 F.R.D. at 426-27; *MacNamara*, 2007 U.S. Dist. LEXIS 17478 at *12; *Hobley v. Burge*, 2006 U.S. Dist. LEXIS 37229 at *10-11. These cases, as well as others, uniformly hold that the communications fail under the third prong of the test for numerous reasons. *Bailey*, 2015 U.S. Dist. LEXIS 97871 at *17-19; *Dorato*, 163 F. Supp. 3d at 892-93; *King v. County of Suffolk*, 121 F.R.D. 180, 192-93 (E.D.N.Y 1988). This Court agrees. The City and Defendant officers have cited to no contrary authority finding that the self-critical analysis privilege shields internal investigation

documents from production, and the Court was unable to find any authority after *University of Pennsylvania*.

The RPD will not stop conducting thorough internal investigations containing forthright communications from the investigator to the RPD Chief of Police merely because the documents may be later produced in civil litigation. *Skibo v. City of New York*, 109 F.R.D. 58, 64 (E.D.N.Y. 1985) ("The police department needs to continue to monitor itself to ensure that department procedures are effective and that officers are complying with these procedures."); *Wiggins*, 173 F.R.D. at 230. The contrary logic leads to the inevitable conclusion that the RPD would simply stop conducting internal investigations, which would result in the RPD never disciplining any officer no matter how egregious the violation. Not surprisingly, no evidence has been provided to the Court to show that the RPD internal investigators would be less than forthright in their communications to the RPD Chief of Police because their communications might be disclosed in subsequent civil litigation. *See Soto*, 162 F.R.D. at 612 (no empirical evidence to support the purported "chilling effect"); *Kelly*, 114 F.R.D. at 665-66. As shown previously, no reasoned basis exists for this purported "chilling effect."

The Report fails on the third prong of the test, even if this Court were to recognize the privilege. Consequently, the self-critical analysis privilege does not prevent the production of the Report.

## CONCLUSION

The Motion is granted. The City has until December 15, 2017 to produce an un-redacted copy of the Report to Plaintiff. (The Report may be stamped "confidential" pursuant to the protective order.) A telephonic status hearing is set for December 20, 2017 at 9:30 a.m., at which time scheduling dates will be amended.

Entered: November 29, 2017          By:_____

                                           Iain D. Johnston
                                           U.S. Magistrate Judge