IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| WILLIAM LUND, </br></br> Plaintiff, </br></br> v. </br></br> CITY OF ROCKFORD, a municipal corporation, Rockford Police Officers SEAN WELSH #3865, TIMOTHY CAMPBELL #3852, and EDDIE TORRANCE #0211, in his individual and supervisory capacities, </br></br> Defendants. | Case No. 17-cv-50035 </br></br> Judge: Frederick J. Kapala </br></br> Magistrate Judge: Iain D. Johnston |

## DEFENDANT WELSH, CAMPBELL AND TORRANCE'S RULE 56.1(A)(1)(3) STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants SEAN WELSH, TIMOTHY CAMPBELL, and EDDIE TORRANCE, by their attorney, Michael F. Iasparro of Hinshaw & Culbertson LLP, and for their Statement of Material Facts in Support of Motion for Summary Judgment, pursuant to Local Rule 56.1(a)(3), state as follows:

### PARTIES

1.   Plaintiff William Lund is, and was at all times relevant to the Complaint, a resident of the City of Rockford. Complaint at ¶5 (Dkt. 1).

2.   The City of Rockford, Illinois ("City") is a municipal corporation in the State of Illinois. Defendant Welsh, Campbell and Torrance's Answers to Complaint at ¶6 (Dkt. 8, 9 and 10).

3.   Defendant Officer Sean Welsh has been a police officer employed by the City's Police Department since August 29, 2005. Exh. A (Welsh Dep., 13:12-13). In May of 2015, Officer Welsh was assigned to the Rockford Police Department's M3 Street Crimes Team, a unit

which generally did not handle calls for service but proactively sought out criminal activity in the City. Exh. A (Welsh Dep., 52:7-11, 52:22-53:4).

4. Defendant Officer Timothy Campbell has been a police officer employed by the Department since August 2005. Exh. B (Campbell Dep., 16:20-24). On May 25, 2015, Officer Campbell was assigned to the Department's M3 Street Crimes Team. Exh. B (Campbell Dep., 27:20-28:1).

5. Defendant Officer Eddie Torrance has been a police officer employed by the Department since October 3, 1994. Exh. C (Torrance Dep., 10:9-11). On May 25, 2015, Officer Torrance held the rank of sergeant and was the supervisor of the Department's M3 Street Crimes Team. Exh. C (Torrance Dep., 20:21-21:15).

## JURISDICTION

6. This Court has original jurisdiction over Counts I, II, III, IV, V, VI and VII of the Complaint, all of which allege violations of Plaintiff's rights under the United States Constitution by persons acting under color of authority by statute, ordinance, regulation, custom and/or usage. 42 U.S.C. § 1983; 28 U.S.C. § 1331.

7. This Court has supplemental jurisdiction over Counts VIII and IX of the Complaint, pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the claims in Counts I-VII within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper in the United States District Court for the Northern District of Illinois, Western Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2), as all defendants reside in the judicial district, and the alleged events or omissions giving rise to the claims occurred in the judicial district.

# MATERIAL FACTS SUPPORTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT OFFICERS

9. On May 25, 2015, the Department's M3 Street Crimes Team conducted a prostitution detail in the City's Midtown District, which is on the near east side of Rockford, an area known for high levels of prostitution activity. Exh. A (Welsh Dep., 63:5-11, 69:8-21). When working such details, female police officers pose as prostitutes in an undercover capacity, while other members of the team provide surveillance and security for the undercover officers from an unmarked vehicle in close proximity to the undercover officers. Other team members remain hidden away in unmarked police cars, awaiting information from the surveillance officer that a potential "john" has made a deal with an undercover officer and should be stopped and arrested. This protocol was being followed during the prostitution detail being conducted by the M3 Street Crimes Team on May 25, 2015. Exh. A (Welsh Dep., 63:5-65:15).

10. The undercover officers posing as prostitutes on the detail were not armed. Exh. A (Welsh Dep., 65:16-18).

11. On May 25, 2015, Officers Welsh and Campbell were in a black unmarked stop car as part of the prostitution detail. Exh. A (Welsh Dep., 67:5-13).

12. When Officers Welsh and Campbell first observed Plaintiff on May 25, 2015, Plaintiff was straddling his bike, or standing near his bicycle, on Broadway in an alley across the street from Arbor Court. Exh. A (Welsh Dep., 70:13-17).

13. Prior to Officers Welsh and Campbell observing Plaintiff that evening, Officer Kubik, one of the female officers posing in an undercover capacity as a prostitute, had contacted Officers Welsh and Campbell and expressed concern that there was a man riding around on a motorized bicycle taking pictures of her and the other undercover officer. Officer Kubik was

3

"kind of weirded out by it." She was "not comfortable with him [Plaintiff] taking pictures." Exh. A (Welsh Dep., 71:15-72:1; 72:11-13).

14. Upon receiving this information, Officers Welsh and Campbell approached Plaintiff. Officer Campbell asked Plaintiff to leave the area and stop taking pictures, because they were concerned Plaintiff was interfering with the police detail and investigation. At that point, Plaintiff was approximately half a block away from the undercover operation. Exh. A (Welsh Dep., 74:1-75:5; 76:1-4).

15. Plaintiff questioned Officers Welsh and Campbell as to why he had to leave, whether he was breaking the law, and how far away he needed to be. Officer Campbell explained to Plaintiff they were conducting a detail and he wanted Plaintiff to leave. Officer Campbell did so in order to protect the integrity of the detail and the safety of the undercover officers. Exh. A (Welsh Dep., 76:19-77:6); Exh. B (Campbell Dep., 35:1-11; 36:3-16).

16. Officer Campbell told Plaintiff that he was not breaking any laws at that time, but that if he did not leave he would be arrested because his continued presence was going to constitute obstruction. Exh. B (Campbell Dep., 36:3-16).

17. Plaintiff never identified himself as a reporter or member of the press to Officers Welsh and Campbell. Exh. A (Welsh Dep., 77:13-18).

18. Upon being told to leave the area, Plaintiff began to leave on his motorized bicycle in the direction of the undercover officers. As he passed the undercover officers, Plaintiff, very demonstratively, waved at the undercover officers and yelled out in a very loud voice, "Goodbye, Officers." Exh. A (Welsh Dep., 77:21-78:3); Exh. B (Campbell Dep., 39:4-40:10; 40:24-41:5).

19. Officers Welsh and Campbell, who were approximately one-half block away when Plaintiff yelled at the undercover officers, heard Plaintiff over the noise of Plaintiff's motorized bicycle, and observed that Plaintiff's statement was directed at the two undercover officers working on the street corner at the time. Exh. A (Welsh Dep., 77:21-78:8; 78:17-20).

20. At that point, Officers Welsh and Campbell made the decision to arrest Plaintiff, based on their concern for the safety of the undercover officers, due to Plaintiff's taking pictures of the undercover officers in the area where they were conducting the prostitution detail and then in a very loud voice identifying them as police officers. Exh. A (Welsh Dep., 80:20-82:2).

21. Officers Welsh and Campbell believed Plaintiff was attempting to compromise the undercover prostitution detail, and that Plaintiff's act of waving at the undercover officers and yelling, "Goodbye, Officers" in their direction was an intentional act aimed at alerting other people in the area to what the undercover officers were doing. Exh. A (Welsh Dep., 83:13-24); Exh. B (Campbell Dep., 41:6-14; 65:9-22).

22. Officers Welsh and Campbell then began pursuing Plaintiff, who was heading west on Broadway. They caught up to Plaintiff at Broadway and 9th Street, where Plaintiff turned left, or southbound, on 9th Street, which is a one-way street heading north – meaning Plaintiff was operating his motorized bicycle going the wrong way on a one-way street. Exh. A (Welsh Dep., 85:10-87:7); Exh. B (Campbell Dep., 44:2-45:22).

23. Officers Welsh and Campbell turned in behind Plaintiff on 9th Street and paced him along a flat area of the street going approximately 24 mph. Officer Welsh, who was driving, did so by looking at his vehicle's speedometer and traveling the same speed that Plaintiff was traveling. Officer Welsh believed that the bicycle Plaintiff was riding, which had a motor attached to it, could be classified as a motor vehicle under Illinois law. Exh. A (Welsh Dep.,

301255380v1 0996346

87:23-89:6; 89:24-90:9). Officer Welsh also believed Plaintiff weighed around 170 pounds that evening, which Plaintiff confirmed. Exh. A (Welsh Dep., 138:17-24); Exh. E (Lund Dep., 21:20-22:1).

24. Officers Welsh and Campbell stopped Plaintiff shortly thereafter and arrested him for obstructing a police investigation, based upon his actions which interfered with the undercover police operation that the M3 Street Crimes Team was conducting. Exh. A (Welsh Dep., 90:24-92:1).

25. On the evening of Plaintiff's arrest, Officer Campbell filled out a Probable Cause Statement summarizing the bases for Plaintiff's arrest. Exh. D (Probable Cause Statement, Exh. 1 to Campbell Dep.); Exh. B (Campbell Dep., 49:1-9; 51:9-53:12). That Probable Cause statement, setting forth the facts that established probable cause for Plaintiff's arrest, reads as follows:

> On Sunday, 5/25/15 at 2330 hours, officers from the M3 street team were conducting a prostitution detail in the mid town district. Undercover officers were at the intersection of Parmele St and Broadway. During our detail William Lund arrived on his bike and began to video record and photograph the undercover officers from less than a block away. Due to William circling the area on his motorized bike, and him stopping several times to photograph and record officers we felt his activities were compromising the success of our detail. Officer Welsh and I approached William advising him that we were conducting the detail and that his presence was interfering with our detail. He was told to leave the area. William eventually agreed to leave. As he rode away he rode past the undercover officers waiving (sic) at them yelling very loudly, "good by[e] officers". His waiving (sic) gesture and loud "good bye" announcement to the female undercover officers alerted any potential "johns" in the area to our detail. Officer Welsh and I again stopped William after watching him ride away south bound in the 1500 block of 9th St on his motorized bike. 9th St is a north bound only street in the 1500 block. We paced him on his motorized bike at 24 MPH which lead us to believe the engine he had on his bike is over 1 horsepower which requires a drive[r]s license to be operated. William has a revoked Illinois driver's license with a previous conviction on 11-5-12 under court case number 2011TR51068. William also had no insurance for the vehicle.

26. Officers Welsh and Campbell's supervisor, Sergeant Torrance, after reviewing the probable cause statement, approved Plaintiff's arrest based on the totality of the circumstances,

6

including the fact that Plaintiff knew the female officers were working in an undercover capacity, Plaintiff loudly yelling "Goodbye officers" and waving in their direction when he passed them by, and due to a concern that any photographs or videos Plaintiff had taken of the undercover officers might be posted on social media, with potential harm to the officers resulting therefrom.  Exh. C (Torrance Dep., 60:16-61:5; 61:17-62:10).  Sergeant Torrance never encountered Plaintiff the night of his arrest, and never even went to the scene of the arrest.  Exh. C (Torrance Dep., 21:16-20).

27. On the night of his arrest, Plaintiff was affiliated with an organization called Rockford Scanner whose purpose, according to Plaintiff, is "to provide the news in a timely fashion to the public," particularly crime based events.  Rockford Scanner does so by posting information, photographs and video on its website and Facebook page.  Exh. E (Lund Dep., 15:14-23; 90:16-21).  Plaintiff has no background in journalism or any credentials or degrees in the field of journalism.  Exh. E (Lund Dep., 12:15-19).

28. Officers Welsh and Campbell, on the night of Plaintiff's arrest, were familiar with his affiliation with Rockford Scanner, and that Plaintiff often posted pictures of law enforcement activity on the Rockford Scanner website.  Exh. A (Welsh Dep., 82:10-83:3); Exh. B (Campbell Dep., 33:8-10).

29. Subsequent to Plaintiff's arrest, Officers Welsh and Campbell searched Plaintiff's person incident to the arrest and, with input from their supervisor Sergeant Torrance, decided to seize Plaintiff's cell phone and tag it into evidence because they believed it contained photographs and/or videos that Plaintiff took of the undercover officers, which would substantiate their concern that Plaintiff had photographs and/or videos which he may post on social media, which in turn could have put the undercover officers in jeopardy and danger.  Exh.

A (Welsh Dep., 93:7-22; 94:10-15); Exh. B (Campbell Dep., 64:12-19); Exh. C (Torrance Dep., 28:6-24); Exh. E (Lund Dep., 41:1-42:3).

30.　　　Also subsequent to Plaintiff's arrest, Officer Welsh ran Plaintiff's name through his squad car's computer system and learned that Plaintiff's driver's license was revoked as of that date. Exh. A (Welsh Dep., 96:16-19).

31.　　　Under Illinois law, it is an offense for a person to operate a motor vehicle while that person's driver's license is revoked. 625 ILCS 5/6-303(a).

32.　　　Under Illinois law, it is an offense for a person to operate a motor vehicle going the wrong way on a one-way street. 625 ILCS 5/11-708.

33.　　　The Illinois Vehicle Code defines a motor vehicle as "[e]very vehicle which is self-propelled and every vehicle which is propelled by electric power obtained from overhead trolley wires, but not operated upon rails, except for vehicles moved solely by human power, motorized wheelchairs, low-speed electric bicycles, and low-speed gas bicycles." 625 ILCS 5/1-146.

34.　　　The Illinois Vehicle Code defines low-speed gas bicycles as "[a] 2 or 3-wheeled device with fully operable pedals and a gasoline motor of less than one horsepower, whose maximum speed on a paved level surface, when powered solely by such a motor while ridden by an operator who weighs 170 pounds, is less than 20 miles per hour." 625 ILCS 5/1-140.15.

35.　　　Subsequent to Plaintiff's arrest, the officers impounded Plaintiff's motorized bicycle because they determined it was a motor vehicle which he had been operating while his driver's license was revoked, and without insurance. Exh. A (Welsh Dep., 96:20-24).

36.　　　The criminal and traffic charges against Plaintiff were eventually dismissed by the Winnebago County State's Attorney's Office, with no reason given, and without any decision or

judgment on the merits. Exh. F (Order of Dismissal, Exh. 7 to Lund Dep.); Exh. E (Lund Dep., 56:16-57:16).

37. Plaintiff was never told by any police officer involved in his arrest that he was only being detained for photographing or documenting police activity that was occurring on the street the evening of his arrest, contrary to the allegation in paragraph 28 of the Complaint that "Plaintiff was only detained by Defendant Officers for photographing and documenting the police activity that was occurring on a public street, not for any of the crimes of which he was falsely charged." Exh. E (Lund Dep., 102:13-18); Complaint at ¶ 28.

38. The only evidence of First Amendment retaliation against Plaintiff is his belief that such was a basis for his arrest. Exh. E (Lund Dep., 112:14-113:7).

39. Certain local media outlets reported news that arrests had been made the evening of May 25, 2015, in relation to a prostitution sting conducted by the Rockford Police Department. Exhs. G and H (Media Reports, Exhs. 5 and 6 to Lund Dep.); Exh. E (Lund Dep., 128:22-130:13). The news reports accurately reported that Plaintiff was charged with obstructing an officer, aggravated driving with a revoked license, driving the wrong way on a one-way street and driving without insurance. *Id.* No media report of the arrests reported that Plaintiff was charged with any prostitution-related offense. *Id.*

40. Plaintiff is unaware of any evidence that Officer Welsh, Officer Campbell or Officer Torrance were involved in any way in authoring, drafting or disseminating any press release regarding his arrest or any of the arrests made in relation to the prostitution sting on May 25, 2015. Exh. E (Lund Dep., 110:2-20; 113:8-21).

41. Plaintiff conceded under oath that his driver's license was revoked on May 25, 2015. Exh. E (Lund Dep., 24:19-25:8).

9

42. Plaintiff knew the evening of May 25, 2015, prior to his interaction with police, that Rockford police were involved in an undercover prostitution detail in the Broadway area. Exh. E (Lund Dep., 27:16-28:15; 30:8-22; 31:10-22).

43. Plaintiff conceded under oath that he rode his motorized bicycle the wrong way on a one-way street (Ninth Street) as he rode away from Officers Welsh and Campbell. Exh. E (Lund Dep., 36:16-37:13).

44. Plaintiff conceded under oath that the motor on his bicycle the evening of May 25, 2015 was 80cc in size, capable of going up to 30 miles per hour. Exh. E (Lund Dep., 98:2-9).

45. Plaintiff conceded under oath that if the police officers believed he was going to post photos of undercover officers posing as prostitutes on social media, such could compromise the police investigation. Exh. E (Lund Dep., 32:19-33:4).

46. At paragraph 27 of the Complaint, Plaintiff alleged, "After Plaintiff was handcuffed, he advised Defendants Welsh and Campbell that he had a copy of the statute on his person that showed he was able to operate his low powered bicycle without insurance or a driver's license. The Defendants retrieved Plaintiff's copy of the statute, examined it, and proceeded to ticket Plaintiff anyway." Complaint, ¶ 27.

47. At his deposition, Plaintiff claimed to have brought the copy of the statute referenced in paragraph 27 of his Complaint with him, which is the same copy he claims to have handed to the Defendant officers the evening of May 25, 2015. Exh. I (Copy of low-speed gas bicycle statute, Exh. 11 to Lund Dep.); Exh. E (Lund Dep., 65:12-67:17). When it was pointed out to Plaintiff at his deposition that the copy of the referenced statute – which he claimed he had handed to the Defendant officers on May 25, 2015 – actually contained a print-stamp of May 27,

10

2015, and so could not have been provided to the Defendant officers, Plaintiff indicated he must have been "mistaken." *Id.*

Respectfully submitted,

HINSHAW & CULBERTSON LLP

/s/ Michael F. Iasparro
Michael F. Iasparro

Michael F. Iasparro
Hinshaw & Culbertson LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
Telephone: 815-490-4900
Facsimile: 815-490-4901
miasparro@hinshawlaw.com