IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM LUND, | ) | |
| | ) | Case No. 17-cv-50035 |
| Plaintiff, | ) | |
| | ) | Judge: Frederick J. Kapala |
| v. | ) | |
| | ) | Magistrate Judge: Iain D. Johnston |
| CITY OF ROCKFORD, a municipal | ) | |
| corporation, Rockford Police Officers SEAN | ) | |
| WELSH #3865, TIMOTHY CAMPBELL | ) | |
| #3852, and EDDIE TORRANCE #0211, in his | ) | |
| individual and supervisory capacities, | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 4
# Deposition of Defendant Eddie Torrance

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM LUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | NO. 17-cv-50035 |
| | ) | |
| CITY OF ROCKFORD, et al., | ) | |
| | ) | DEPOSITION OF |
| | ) | DETECTIVE |
| Defendants. | ) | EDDIE TORRANCE |

      The deposition of Detective Eddie Torrance, called as a witness by the plaintiff in the above-entitled action, taken before Therese A. Wasilewski, Registered Professional Reporter and Certified Realtime Reporter, at Hinshaw & Culbertson, 100 Park Avenue, Rockford, Illinois, on January 26, 2018, at 2:10 p.m.

## Page 2

```
 1  APPEARANCES:
 2
 3              MEYER & KISS, LLC
                By ATTORNEY LOUIS J. MEYER
 4              311 West Stratford Drive
                Peora, Illinois  61614
 5              Phone:  309.713.3751
                email:  louismeyer@meyerkiss.com
 6
                      appeared on behalf of the plaintiff;
 7
 8
                HINSHAW & CULBERTSON
 9              By ATTORNEY MICHAEL F. IASPARRO
                100 Park Avenue
10              Rockford, Illinois  61101
                Phone:  815.490.4900
11              email:  miasparro@hinshawlaw.com
12                    appeared on behalf of Officer Sean Welsh,
                      Investigator Timothy Campbell and
13                    Detective Eddie Torrance, defendants;
14
15              CITY OF ROCKFORD DEPARTMENT OF LAW
                By ATTORNEY IFEANYI C. MOGBANA
16              425 East State Street
                Seventh Floor
17              Rockford, Illinois  61104
                Phone:  779.348.7154
18              email:  ifeanyi.mogbana@rockfordil.gov
19                    appeared on behalf of City of Rockford,
                      defendant.
20
21
22  ALSO PRESENT:
23              Officer Sean Welsh
24              Investigator Timothy Campbell
```

## Page 3

```
 1                     I N D E X
 2         EXAMINATION OF:  DETECTIVE EDDIE TORRANCE
 3
 4  By Mr. Meyer.........................................   4
 5  By Mr. Iasparro......................................  60
 6  By Mr. Meyer.........................................  62
 7
 8
 9                     E X H I B I T S
10
11  Torrance Exhibit No. 1...............................   5
12  Torrance Exhibit No. 2...............................   8
13  Torrance Exhibit No. 3...............................  38
14    (Exhibits 1 and 2 were not retained by the reporter.)
15
...
23  Signature Page.......................................  65
24  Reporter Certificate.................................  66
```

## Page 4

 1              DETECTIVE EDDIE TORRANCE,
 2  having been first duly sworn, was examined and testified as
 3  follows:
 4                    EXAMINATION
 5              BY MR. MEYER:
 6      Q.   Sir, could you please state and spell your full
 7  name for the record.
 8      A.   Eddie Torrance.  E-d-d-i-e.  Last name is
 9  T-o-r-r-a-n-c-e.
10      Q.   And what is your badge number?
11      A.   Right now it's 33.
12      Q.   What do you mean by "right now"?
13      A.   When I was a sergeant it was 430 and prior to
14  that it was 262.
15      Q.   And is there any significance on the numbering of
16  them?
17      A.   The 400 series are the supervisor numbers.  The
18  others, the lower numbers, are just handed out as you get
19  hired or . . .  Yeah, they're handed out when you get
20  hired.
21      Q.   So currently your badge is 33?
22      A.   That's correct.
23      Q.   And when did that switch happen?
24      A.   April 2016.

## Page 5

 1      Q.   And why was there a switch?
 2      A.   Well, I took a self-demotion due to an internal
 3  investigation, meaning I pretty much gave up my sergeant
 4  stripes.
 5              (Torrance Exhibit No. 1 was
 6              marked for identification.)
 7  BY MR. MEYER:
 8      Q.   You're an investigator now; is that correct?
 9      A.   That's correct.
10      Q.   I have placed in front of you what we have marked
11  as Torrance Exhibit No. 1.  Do you have Torrance Exhibit
12  No. 1 in front of you?
13      A.   I do.
14      Q.   And is this what you were referring to when you
15  took a self-demotion?
16      A.   Correct.
17      Q.   And what was this in reference to?
18      A.   There was an internal investigation to where I
19  was -- I had began dating one of my employees, and due to
20  that issue I took a self-demotion.
21      Q.   A fellow officer?
22      A.   Correct.
23      Q.   So this is not related to this investigation.
24      A.   No, it is not.

**Page 6**

1 Q. And when you say a public hearing, what is that
2 in reference to?
3 A. Does it say public hearing? Oh, Chief Hoey, for
4 lack of a better term, threatened to take me to the Police
5 and Fire Commission and the Police and Fire Commission
6 hearings are public.
7 Q. Over this internal investigation?
8 A. Correct.
9 Q. If you wouldn't take this reduction or get rid of
10 your stripes?
11 A. That is correct.
12 Q. And so since April of '16 to now you're a
13 detective?
14 A. That is correct.
15 Q. Okay. Got it. And besides that have you been
16 disciplined in any other way with the Rockford Police
17 Department?
18 A. This incident and --
19 Q. Just for the record, "this incident" referring to
20 the --
21 A. Referring to the Mr. Lund incident. And I'm
22 drawing a blank on any others.
23 Q. Was there some discipline in September of 2012
24 whereas it said his Duty No. 5, Section 2 of rules related

**Page 7**

1 to the inappropriate personal relationship with a female
2 subordinate?
3 A. That's the one that is entailed in -- what year
4 was that?
5 Q. It said September 20th, 2012 in your personnel
6 file.
7 A. I believe it's all under this exact one.
8 Q. And by "this exact one," you're referencing
9 Exhibit 1?
10 A. Exhibit 1, correct.
11 Q. So it may have been spanning that period of time
12 of the investigation?
13 A. Correct.
14 Q. Besides that any other discipline?
15 A. I cannot recall.
16 Q. Were you suspended back in 1995?
17 A. Yes.
18 Q. And do you recall what that was for?
19 A. Traffic crash. It was not a traffic crash, but
20 it was a crash into a tree in a park.
21    MR. IASPARRO: For the record, I'll object to the
22 relevance of any other unrelated discipline unrelated to
23 the Lund matter.
24    MR. MEYER: Mark this as No. 2.

**Page 8**

1    (Torrance Exhibit No. 2 was
2    marked for identification.)
3 BY MR. MEYER:
4 Q. Detective, I placed in front of you what we've
5 marked as Torrance Exhibit 2. Do you have Exhibit 2 in
6 front of you?
7 A. I do.
8 Q. And do you recognize this document?
9 A. Yes, I do.
10    MR. IASPARRO: Counsel, for the record, both 1
11 and 2 are marked "Confidential: Subject to Protective
12 Order."
13    MR. MEYER: So we will not make these exhibits to
14 the record, but just so you have reference to them in front
15 of you.
16    THE WITNESS: Okay.
17 BY MR. MEYER:
18 Q. What was this letter in reference to?
19 A. A number of police department personnel -- our
20 computers are not regulated, and at some point we all --
21 I'm going to go back to me, I'm sorry. I accessed naked
22 photos.
23 Q. So while you were on duty you looked at adult
24 content Web sites?

**Page 9**

1 A. That is correct.
2 Q. And do you know how that came to the attention of
3 the department?
4    MR. IASPARRO: Object to the relevance of this.
5 If you know.
6 A. I do not know. I'm sorry.
7 BY MR. MEYER:
8 Q. I'm just saying, do you know if other officers
9 complained?
10 A. I can't recall.
11 Q. Okay. I won't make this an exhibit because it's
12 confidential. I'm going to put in front of you what's
13 Bates stamped Officers 979. This appears to be a letter
14 regarding that suspension?
15 A. Yes.
16 Q. Do you think that was for some type of --
17 A. That was for a car accident.
18 Q. That they deemed to be avoidable or something?
19 A. Oh, yes.
20 Q. What do you mean by "Oh, yes"?
21 A. Well, I was -- there was a suspect who was
22 involved in some shootings way out west. He took Pierpont
23 all the way down to Montague and then he was going back
24 into the city on Montague going north.

Page 10

1  I was behind -- I'm sorry. One of our original
2  tac team squads was following this car and I tried to
3  assist him by catching up. I ended up cutting through a
4  park and hitting a tree going through the park.
5  Q. Besides what we have just covered, can you recall
6  any other discipline you may have received while with the
7  Rockford Police Department?
8  A. I don't recall.
9  Q. And when did you join the Rockford Police
10 Department?
11 A. October 3rd, 1994.
12 Q. And prior to joining the Rockford Police
13 Department, did you work for any other law enforcement
14 agencies?
15 A. I did not.
16 Q. What was your last full-time job before joining
17 the Rockford Police Department?
18 A. I didn't have any.
19 Q. You went straight into the police department?
20 A. Correct.
21 Q. And let's get your educational background. Take
22 me from high school to today.
23 A. I graduated Guilford High School in 1990. I
24 attended Western Illinois University for a bachelor's in

Page 11

1  law enforcement and justice administration, and that was
2  1996 when I finally completed that.
3  Q. Okay. So you had already been hired on and were
4  doing it part-time?
5  A. Correct. I got hired here and finished up my
6  core, if you will, the basics here at Rock Valley.
7  Q. Okay. And after that bachelor's any other formal
8  education, a master's or anything?
9  A. No.
10 Q. And so in '94 you got hired on and you went
11 through the academy and then you do your field training
12 program, correct?
13 A. Correct.
14 Q. And then once you complete that you're a patrol
15 officer?
16 A. Correct.
17 Q. And how long were you in patrol?
18 A. Three years and -- almost four years.
19 Q. And what was your next assignment after the three
20 to almost four years?
21 A. I went to the Rockford Housing Authority
22 Community Policing Unit, which is still in patrol but it
23 was a special unit.
24 Q. And is that unit still around?

Page 12

1  A. It is now. It was gone for a while and then they
2  brought it back.
3  Q. And I'm assuming you were assigned to the
4  projects?
5  A. The projects, yeah.
6  Q. And how long were you in that unit?
7  A. I believe it was a year and a half, and then I
8  was promoted to traffic.
9  Q. And that would have been as a detective/
10 investigator?
11 A. Investigator.
12 Q. So is that about '98-'9?
13 A. Roughly. I don't know the time line. I can tell
14 you that I moved around a lot.
15 Q. So when you were in the Rockford Housing
16 Authority, did you actually like -- did you have a station
17 right in one of the complexes?
18 A. No. We always left from downtown; but we had the
19 office buildings that we could stop in and, you know, park
20 our bikes and walk around and things like that.
21 Q. Was it mostly just foot patrol on the grounds?
22 A. Foot patrol, bike patrol. Yup.
23 Q. And you're there for a year and a half and then
24 you get promoted to investigator and you go into traffic.

Page 13

1  A. Correct.
2  Q. Is that similar to what Officer Campbell was just
3  telling us that you were doing?
4  A. That's correct.
5  Q. And how long were you in the traffic unit?
6  A. Six years.
7  Q. And what was your next assignment?
8  A. I got moved to the detective bureau and I was
9  assigned as a burglary detective for about a month and then
10 I went to the violent crimes unit.
11 Q. So does it go -- I guess investigator in traffic;
12 and then when you go to detectives, you get called a
13 detective?
14 A. Correct.
15 Q. Is that a pay difference?
16 A. No. Not from investigator to detective, no.
17 Q. Is it just similar but you're called a detective?
18 A. I'm not sure why they did that. Detective
19 because they were in plain clothes and investigator because
20 you're in uniform. So only the traffic guys were called
21 investigators.
22 Q. And that six years you were in there, did you bid
23 then to go to the detective bureau?
24 A. Well, you can put a request in, yeah.

14

1  Q. And then you said you were doing burglaries for a
2  month and then went to violent crimes?
3  A. Correct.
4  Q. And were you switched or did you apply?
5  A. I requested to go.
6  Q. And how long were you a detective in violent
7  crimes?
8  A. I got promoted to sergeant in January of --
9  correction. Give me a second.
10 Q. Sure.
11 A. January 2009.
12 Q. So you were a detective in violent crimes during
13 that time until you got the promotion?
14 A. Correct.
15 Q. And again you had to take the sergeant's test?
16 A. Yes.
17 Q. How many times prior to that time had you taken
18 it?
19 A. That was the first time.
20 Q. And then if you had a passing score, then is
21 there a committee to select who gets that promotion?
22 A. You go in front of the Board of Police and Fire
23 Commissioners, and you've got to take a written test and
24 then you've got to take an oral interview. And then they

15

1  add on your time in the department in increments and then
2  you end up on a list, and they just go straight down the
3  list unless there's some extenuating circumstances.
4  Q. Got it. So once you get promoted to sergeant,
5  where did you next go?
6  A. I was sergeant of patrol on nights, and I stayed
7  on nights until I went to NRU, which is M3. M3 Streets
8  Team was switched over a couple times. They tried to do
9  this -- initially we were all working out of one building
10 and then they wanted to try to evaluate the idea of going
11 outside and making three different districts, which is what
12 they finally came to.
13      So when they made up this district, which would
14 have been the lower east side of town, they changed the
15 name of M3 to NRU. So they had a stand-alone M3 team and
16 then a second team was called NRU, neighborhood response
17 team.
18 Q. So those were two different type of tactical
19 teams?
20 A. Initially they were the exact same thing. But if
21 you bid for one, because of the hours or something, you
22 could morph over into the district and be the NRU team,
23 which encompassed doing community service stuff as well as
24 tactical stuff.

16

1  Q. When did you join -- I guess was it M3 when you
2  joined it or did you go straight to NRU?
3  A. It was NRU. I finished Deputy Chief Ogden's
4  stint on -- I'm trying to remember -- '14. I believe at
5  the end of 2014 it was still NRU.
6  Q. And so you came into the NRU as the sergeant?
7  A. Correct.
8  Q. And is there just one or was there a sergeant for
9  M3 and NRU?
10 A. Correct, two separate ones. The rest of the city
11 had M3 still; but this district had NRU, which had again
12 morphed.
13 Q. So you were the sergeant of NRU at that point in
14 the district?
15 A. Correct.
16 Q. Who was the sergeant for M3 at that time?
17 A. For the opposite side?
18 Q. Exactly.
19 A. I think it was Rich Gambini.
20 Q. And when you were the -- when you came in as
21 sergeant at NRU, how many officers did you have under you?
22 A. I believe there were eight.
23 Q. And then who was your direct supervisor when you
24 first came in?

17

1  A. Lieutenant Spades.
2  Q. Spades?
3  A. S-p-a-d-e-s.
4  Q. And then at some point did they merge together or
5  are they still separate now?
6  A. The M3 teams are still separate. Even though
7  they went back to M3, there was always a separate crew --
8  another crew of eight. So there was a total of 16, but up
9  to 20. At one point it was 10 and 10, but attrition took
10 care of that.
11 Q. At some point did you switch from NRU to M3?
12 A. Yes, but on the same side of the river. I mean,
13 they got rid of NRU and turned it back to M3. NRU was
14 going for a year. This district policing unit went for a
15 year. It was like a trial period.
16      So the change for that year, they named it NRU
17 because they wanted to use -- instead of having community
18 service officer, they used the M3 team, M3/NRU, as
19 community service.
20      And so you got assigned -- the guys were assigned
21 an actual area. So if there was any meetings during the
22 day where the aldermen or somebody wanted to speak to them,
23 those guys would go out there and do that. They would
24 adjust their hours and come in early to be there and do

18

1  that and then come to work at night.
2      Q.  When did this shift change with the district?
3      A.  At the new year.
4      Q.  Of 2014?
5      A.  At the end of 2014.
6      Q.  And then so beginning in 2015, which is the year
7  this happened, what was the arrangement?
8      A.  It was back to the M3.
9      Q.  Okay.  And when you were the sergeant with NRU,
10 what were your general duties and responsibilities?
11     A.  I was kind of the clearinghouse, but reading
12 reports, reviewing reports, the go-between, as in the go-
13 between between my guys and the lieutenant.
14         He would get, you know, calls on problem areas
15 and he would give us assignments.  He would give them
16 through me and then I would hand them out to the team.
17     Q.  So specifically for like one of these
18 prostitution details, would it be like, "Hey, we've been
19 seeing a lot of activity and we've been getting calls.  We
20 want you to focus on this area"?
21     A.  Correct.
22     Q.  So that would come from the lieutenant?
23     A.  Correct.
24     Q.  And do you know where the lieutenant would get

19

1  that information?
2      A.  No.  He would just leave it blank and say, "Hey,
3  I got some information that there was a bunch of ladies
4  walking around over here" and then he would tell us the
5  location.
6          Obviously we knew because we worked the area, so
7  it wasn't difficult to figure out where.  And then after a
8  while he just said that we need some prostitution stings.
9      Q.  So each time you did one of these details, was it
10 usually ordered by the lieutenant or could you on your own
11 just say, hey, tomorrow I'm going to do one of these?
12     A.  I could do it on my own, but usually it came from
13 above us.
14     Q.  Would that be similar for like controlled drug
15 buys that, hey, this area has been -- there's been reports
16 this is a hot area and we want some controlled buys?
17     A.  Correct.
18     Q.  So if you didn't have any details, it would just
19 be routine patrol out looking for crime?
20     A.  Or we could be building our own case for these
21 drug buys and talking to the prostitutes.  I mean, that's
22 where a lot of information comes.
23     Q.  They provide it to you?
24     A.  Oh, yeah.

20

1      Q.  And so typically would you be on the street when
2  you were working?  Would you be out or would you be in the
3  office?
4      A.  Both, both.
5      Q.  And so when it turned back to M3 in 2005, where
6  was your desk?
7      A.  In 2005 it was --
8      Q.  In 2015.  I'm sorry.
9      A.  420 West State.
10     Q.  But at one point you were in District 3?
11     A.  No.  We never moved out of the building because,
12 I mean, we tried to keep our footprint in one place at the
13 time; but they tried to make us that we stood alone within
14 the building.
15     Q.  Okay.  So any given day you could be at the desk
16 but your reports are actually out on the street?
17     A.  That's correct.
18     Q.  And would you participate in these type of sting
19 operations too or just be supervision?
20     A.  Both.
21     Q.  For this particular one on May 25th, 2015, do you
22 recall what officers were assigned to this detail?
23     A.  Welsh and Campbell, I believe Jury and Mike Lang,
24 myself.  And then we had two -- I think we had two girls

21

1  out, Kubik and Lochner.
2      Q.  And so obviously Welsh and Campbell are one stop
3  car; is that correct?
4      A.  Yup.
5      Q.  And then you said Jury and Lange, were they
6  another stop car?
7      A.  Correct.
8      Q.  And then would you have one person then for
9  surveillance or the eyes?
10     A.  Correct.
11     Q.  And was that what you were doing or . . .
12     A.  No.  I was acting as an oversight, but I was
13 actually going to be a -- I mean, if there was enough cars
14 and people checking on the girls, I would actually go out
15 and stop a car.
16     Q.  Were you on the scene when this incident happened
17 with Mr. Lund?
18     A.  I was on a traffic stop at the time.
19     Q.  Of someone that tried to pick up a prostitute?
20     A.  That's correct.
21     Q.  So prior to that stop had you seen him ride
22 around on his bicycle or anything?
23     A.  No.  But I don't know where I was sitting prior
24 to me getting the call for this stop.

22

1  Q. Okay. And do you know what time your guys' shift
2  started on May 25th, 2015?
3  A. I don't recall.
4  Q. And do you know what you time you ended the
5  detail?
6  A. I don't recall that either.
7  Q. And again I'm assuming you could probably look at
8  time sheets to see when you went off the clock or . . .
9  A. Yes. I would assume they still have the time
10 sheets around there.
11 Q. And back when you were the sergeant in one of
12 these units, did officers have to turn in like activity
13 logs for you, like whatever they did that day?
14 A. No.
15 Q. And prior to May 25th of 2015, did you know
16 William Lund?
17 A. No.
18 Q. And were you familiar with Rockford Scanner?
19 A. No.
20 Q. So going back to May 25th, 2015, you were
21 actively involved in this detail; fair?
22 A. That's correct.
23 Q. Do you know how many traffic stops you were on
24 prior to Mr. Lund?

23

1  A. How many stops total?
2  Q. Prior to 11:30, whenever this incident happened,
3  do you know if you had made prostitution arrests prior to
4  that?
5  A. I can't say.
6  Q. But at the time when you got the call, you were
7  actually on one?
8  A. That is correct.
9  Q. And what was the first information you received?
10 A. About what?
11 Q. Mr. Lund.
12 A. I was in the middle of my traffic stop dealing
13 with my guy or securing him in my car when I believe Sean
14 Welsh called and said that they had a guy in custody.
15 Q. And at that point did you know what he was in
16 custody for?
17 A. No.
18 Q. So is that something you would have gotten over
19 either like Channel 5 or that detective channel?
20 A. No. Probably by phone.
21 Q. Cell phone?
22 A. Yeah. I mean, he probably would have called me
23 over the radio to say, hey, we got a guy in custody, I got
24 a PC, probable cause statement; and then I would have

24

1  called him.
2  Q. There's like a number you put out if you want
3  someone to call you on a cell phone. Is it like a 21
4  or . . .
5  A. Oh, no. I would have just called him direct. I
6  mean, if I was tied up on this traffic stop, I would have
7  told him I was going to call him back or -- and I don't
8  know how it went over. We could have talked on the phone,
9  but it could have came over the radio that he had somebody
10 in custody.
11 Q. While you're handling your arrestee, you monitor
12 the radio traffic that Welsh had somebody in custody too.
13 A. As much as I can. I was probably on 5 making my
14 traffic stop.
15 Q. I'm sorry?
16 A. I was probably on Channel 5 making my traffic
17 stop.
18 Q. Getting this person's info?
19 A. Well, letting the radio know that I was out of
20 the car.
21 Q. And that's when you heard that Welsh was down on
22 a traffic stop too, correct?
23 A. No. I think he called me and told me.
24 Q. He called you on your personal cell phone?

25

1  A. I believe so.
2  Q. And you just said, "I'll call you back when I'm
3  done with mine"?
4  A. Yes.
5  Q. And did he tell you what type of -- whether it
6  was a prostitution stop or something else?
7  A. When I finally got to him?
8  Q. The initial call.
9  A. No.
10 Q. So I'm assuming at one point you complete --
11 either you get the guy in the back of your seat or
12 whatever. Do you go back over to the scene or what did you
13 do?
14 A. Go back over? I'm sorry.
15 Q. Once you figure out your traffic stop and you get
16 the guy in custody or whatever it is, did you go over to
17 where Officer Welsh was or what did you do?
18 A. No.
19 Q. What did you do then? What did you do next?
20 A. I stayed with my guy and his car, because his car
21 was going to be impounded.
22 Q. Okay. And do you know if -- like does the city
23 do asset forfeitures on these cars too if they're
24 impounded?

Page 26

1  A. They had not. But they were thinking about doing
2  something later, so no. They impound them for a higher
3  rate compared to the standard stop.
4  Q. But they weren't -- like under the statute you
5  can seize someone's car if they're picking up a prostitute.
6  A. It all depends on if the State's Attorney's
7  Office is going to help you out with that.
8  Q. And Winnebago doesn't have its own asset
9  forfeiture division?
10 A. I think it's an asset forfeiture guy, so one guy.
11 At the time it was one guy. But their thing was the city
12 wanted to make more money or make it more punishable to
13 people by charging them a higher rate to get their car
14 back. So I don't even know if that was on the table for
15 them at the time, but that was above us.
16 Q. So the chance that you get more from the impound
17 fee than trying to take this car to auction and selling it?
18 A. Probably.
19 Q. I'm assuming it -- wasn't there a lot of nice
20 cars that you guys were impounding?
21 A. We found some decent cars out there, yeah.
22 Q. So you're obviously waiting for the tow truck to
23 impound the vehicle. What did you do next with regard to
24 Mr. Lund?

Page 27

1  A. Well, I think another car had come over. Another
2  one of the stop cars came over to take over the impound and
3  my guy from me.
4      And I believe I called -- I may have called Sean
5  back or I could be off with the time stamp. He very well
6  could have called me after I was done, but we spoke to each
7  other on the phone and we talked about the case.
8  Q. And tell me what you recall from that
9  conversation.
10 A. That he had a guy who had obstructed our
11 investigation. He was on a -- he had been on a bicycle and
12 that he was going to write him several citations for the
13 bike use.
14 Q. And did you get specific detail about what he did
15 to obstruct at that time?
16 A. I believe he told me -- well, I think he started
17 to write it up and -- I don't know if he had already
18 written up the PC. But they usually call and say, hey, I
19 got a PC that's up and running; or I would tell them to
20 send me the PC so I could review it.
21 Q. And that PC is what we've talked about as the
22 probable cause statement?
23 A. Correct.
24 Q. And do you recall whether or not you observed

Page 28

1  that before Mr. Lund was transported from the scene that
2  night?
3  A. Transported to jail?
4  Q. Correct.
5  A. I would have seen it before he got transported.
6  Q. So after you had this conversation with Officer
7  Welsh where you get a little more detail regarding what the
8  incident was, what did you do next regarding that specific
9  individual?
10 A. Mr. Lund?
11 Q. Mr. Lund.
12 A. After speaking and reviewing the PC, I reviewed
13 it, authorized it and let them know it was done.
14 Q. Okay. At what point was there a conversation
15 regarding his cell phone?
16 A. It would have had to be on the phone, so I'm
17 assuming it was when he was telling me about it. I think
18 he told me about it and then he wrote the PC up; and during
19 him telling me about it, I said, "Take the phone for
20 evidence."
21 Q. And why did you tell him to take the phone?
22 A. For evidence. He was being arrested for
23 obstructing and the phone was part of the issue, and that
24 phone would have had evidence if he was taking photos.

Page 29

1  Q. And as you sit here today, do you know whether or
2  not it's illegal for a citizen to photograph police
3  officers when they're in the public way?
4  A. It's not illegal to do that.
5  Q. And do you know whether or not it's illegal for
6  an individual to call a police officer out?
7  A. No, it's not.
8  Q. As you're doing an undercover buy and someone
9  comes up and says, "Hey, Officer Torrance, do you remember
10 me," is that against the law?
11 A. No, it's not against the law to do that.
12 Q. And after this incident have you been made aware
13 of or investigated Rockford Scanner?
14 A. Have I been made aware of it?
15 Q. After-the-fact.
16 A. Yes.
17 Q. What have you learned about Rockford Scanner?
18 A. That it's a social media site. I'm not on
19 Facebook, but I hear a lot of people talking about it.
20 Q. Have you ever heard fellow supervisors, officers
21 complaining that these guys are showing up on our scenes a
22 lot?
23 A. No.
24 Q. Do you know why Channels 1 and 2 went encrypted?

**Page 30**

1  A. I believe the chief said he wanted it for officer
2  safety.
3  Q. And do you know if it was specifically in
4  response to Rockford Scanner?
5  A. I can't say that.
6  Q. So at any time on May 25th, 2015, did you
7  actually see Mr. Lund?
8  A. No, I did not.
9  Q. You never saw him in cuffs or . . .
10 A. Nope.
11 Q. Did you ever see his bicycle?
12 A. No, I didn't see his bike.
13 Q. And Detective Torrance, do you know if after
14 Mr. Lund was arrested if additional johns were arrested
15 that night?
16 A. I can't say. I can't say for positive.
17 Q. But I'm assuming if we pulled all the arrest
18 reports of all the individuals arrested that night, we
19 could see time stamps of when they were stopped and pulled
20 over.
21 A. Correct.
22 Q. And to see if some of them occurred before or
23 after 11:30?
24 A. That's correct.

**Page 31**

1  Q. Now, at the end of one of these details, as the
2  sergeant is there something that you need to do?
3  A. Well, I take a document -- I'm sorry. I document
4  everybody that we arrested, their specific charges and then
5  I email it to the lieutenant.
6  Q. And because you obviously know where I'm going
7  with this, do you know how the media gets it like the next
8  day?
9  A. It's above me. It would have been the lieutenant
10 or Assistant Deputy Chief Pann.
11 Q. So if you wanted to -- if you wanted to find out
12 how it does get published in the paper, you'd go to your
13 lieutenant or Deputy Pann?
14 A. Yeah. For sure, yeah.
15 Q. And obviously in this case whatever you -- strike
16 that.
17    Did you email the lieutenant this particular
18 night?
19 A. Yes.
20 Q. Would you have used the Rockford Police
21 Department --
22 A. That's correct.
23 Q. Have you looked back for that email?
24 A. I have not.

**Page 32**

1  Q. Do you know if it's preserved?
2  A. Well, they preserve it. I don't know how long
3  they keep all that stuff.
4     MR. MEYER: If I made a request, is that
5  something I'd have to ask Ifeanyi for, for the actual --
6     MR. IASPARRO: For the press release?
7     MR. MEYER: Yeah, the email. Not the press
8  release, the email to the lieutenant.
9     MR. IASPARRO: I'll make a request.
10 BY MR. MEYER:
11 Q. So at the end you'll kind of take a list of
12 here's everyone arrested, these are the charges and then
13 you send it to the lieutenant?
14 A. Correct.
15 Q. And then who they give it to and how they fashion
16 a press release, you don't know.
17 A. Correct.
18 Q. And you heard me ask the other officers. Did you
19 ever go look to see the press release online with regard to
20 this case?
21 A. Recently, yes.
22 Q. And did you ever Google William Lund?
23 A. Yup.
24 Q. And what were the first two things that popped

**Page 33**

1  up?
2  A. Prostitution sting.
3  Q. And just if you look at it that way, it appears
4  that he got arrested -- the appearance would look like he
5  got arrested for picking up a prostitute?
6  A. That's just the title. I mean, you'd actually
7  have to read it.
8  Q. But I'm saying, if you didn't know and Googled
9  his name and it pops up and his name is associated with two
10 prostitution sting arrest articles, it's fair to assume one
11 would assume he was arrested for picking up a prostitute?
12    MR. IASPARRO: Object to form. You can answer if
13 you understand.
14 A. Yeah, I can assume that's what people would
15 think.
16 BY MR. MEYER:
17 Q. And do you know why his name was included in the
18 prostitution detail if he wasn't arrested for prostitution
19 or soliciting?
20 A. I provided the chief or the lieutenant -- I'm
21 sorry, I'm not sure. I'm thinking it's the lieutenant, but
22 I provided him with the names of the people we arrested
23 over the night with their charges.
24 Q. Do you do that every night or just when it's a

34

1 detail?
2    A.  Just when it's a detail.
3    Q.  Whether it's a drug buy or --
4    A.  I'm sorry. Let me re-preface that. The
5 details -- unless it's something major like we stop a guy
6 and he's got a whole lots of drugs or guns on him, they
7 want splash effect stuff sent to them because they don't
8 want to be questioned about it and not know it.
9    Q.  So if it's something that's a bigger type case,
10 you're going to let them know.
11    A.  Correct. If it's a detail, they're given all the
12 names on the detail.
13    Q.  But if it's just kind of an on-view drug
14 transaction with a small amount, you're not going to be
15 emailing those arrest reports?
16    A.  No.
17    Q.  And do you know if it's just prostitution details
18 or other details?
19    A.  All. I mean, can we talk about some of the stuff
20 you spoke to me about? You referred back to them. So if
21 we do these drug raids and things like that, we also send
22 that to them.
23       Again, this is the big picture thing; it's not
24 the small, little guy that had a blunt sitting on the side

35

1 of the road. We're not going to do those.
2    Q.  So more of the mass arrests or a targeted
3 response, you'll disclose that.
4    A.  Correct.
5    Q.  Have you had conversations with the lieutenant or
6 deputy chief that you do that as a deterrent effect?
7    A.  Yes.
8    Q.  Specifically for prostitution it's a shaming, a
9 public shaming?
10    A.  I'm assuming that's what they use it for.
11    Q.  Well, had you gone to any classes or training on
12 how to conduct or run these prostitution stings?
13    A.  No.
14    Q.  But have you seen any literature that you want to
15 put the johns' names out there to try to be a deterrence
16 because it's humiliating?
17    A.  Yes.
18    Q.  So would it be a stretch to imagine if you got
19 arrested for prostitution and your face is all over the
20 paper that it would probably be pretty embarrassing
21 personally?
22    A.  Yes.
23    Q.  So after I guess you guys wrap up -- do you make
24 the determination of when you stop the detail?

36

1    A.  Yes, based on the number of arrests or if it
2 starts slowing down.
3    Q.  Do you have like a target goal, like once we get
4 10 or . . .
5    A.  No, no target.
6    Q.  Kind of like fishing? Once it dries up you call
7 it a day?
8    A.  Yeah, or move somewhere else. Yup.
9    Q.  But as you sit here today, you don't know when
10 you guys stopped this detail.
11    A.  No, I do not.
12    Q.  And then obviously when you did that you had to
13 go back and generate that email, correct?
14    A.  That's correct.
15    Q.  Would that be something you would have done back
16 at the station?
17    A.  Yes.
18    Q.  And then would you have reviewed each one of the
19 arrest reports that were made that night?
20    A.  Yes.
21    Q.  And I think we've looked at one of the arrest
22 reports.
23    A.  I might not have approved them that night, but I
24 could have approved them like the next night I was with

37

1 them.
2    Q.  That's what I was getting at. It probably would
3 have waited to the next morning? It would have gone into a
4 queue until you had time to sit down and read them?
5    A.  Right.
6    Q.  Is there a certain time you're supposed to
7 approve them by?
8    A.  No, there's not.
9    Q.  Just when you have time to get to them?
10    A.  The sooner, the better.
11    Q.  Now, obviously at some point after this you were
12 made aware that Mr. Lund had come in and filed a complaint
13 against the officers conducting this detail; correct?
14    A.  Correct.
15    Q.  What was the first info that you got?
16    A.  I think I just got a letter from my supervisor at
17 the time.
18    Q.  And who was your supervisor at that time?
19    A.  It would have been Lieutenant Spades, but it may
20 not have been him. I mean, it could have been Deputy Chief
21 Pann. I'm not sure who served it.
22    Q.  But you just get a notification saying, hey,
23 there's been an Internal Affairs file investigation opened
24 up; correct?

38

1 A. Correct.
2 Q. Are you given details of what you were accused of
3 doing?
4 A. I don't believe so.
5 Q. And then as part of that, that's when you're
6 required to do the interview and then write a statement;
7 correct?
8 A. You do a statement first.
9 MR. MEYER: Let's mark this as the next exhibit,
10 please.
11 (Torrance Exhibit No. 3 was
12 marked for identification.)
13 (Attorney Ifeanyi Mogbana entered
14 the deposition.
15 BY MR. MEYER:
16 Q. Detective Torrance, I've placed in front of you
17 what we have marked as Torrance Exhibit No. 3. Do you have
18 Exhibit 3 in front of you?
19 A. I do.
20 Q. It's a two-page document?
21 A. Correct.
22 Q. It's Bates stamped Officers 194 and 195 in the
23 lower right-hand corner?
24 A. That's correct.

39

1 Q. Do you recognize this exhibit?
2 A. I do.
3 Q. And what do you recognize it to be?
4 A. It's an officer's report that I drafted to Chief
5 O'Shea.
6 Q. And we'll just go through the narrative portion
7 here. I'm going to read some of it and ask you some
8 questions, okay, Detective?
9 A. Yes.
10 Q. Do you know why yours is to Chief O'Shea versus
11 Lieutenant Watton?
12 A. Because I believe on the documentation when they
13 sent it out it comes from the chief of police.
14 Q. And then we just -- it's like kind of a form that
15 you have that's preprinted -- like the top is preprinted?
16 A. Correct, all the way through the "sir." There's
17 a drop-down for "sir" and you can change it to sir or
18 madame, yes.
19 Q. And then from there it's just like a Word
20 document?
21 A. Correct.
22 Q. So it says, "I am completing this officer's
23 report at the direction of Interim Police Chief Patrick
24 Hoey." And when was he the interim police chief?

40

1 A. He would have been the interim police chief maybe
2 during -- I can't say. I know he finished up last year.
3 I'm sorry. He finished up 2015 until Chief O'Shea came in,
4 which was about March or April of '16.
5 Q. And he was still the chief?
6 A. And still the chief.
7 Q. And prior to, I guess, the interim chief, that's
8 when it was Chet?
9 A. Correct.
10 Q. So at the time this happened, Chet was not the
11 chief of police? You had the interim.
12 A. I believe so.
13 Q. "On the above date and time, I was in charge of a
14 planned prostitution detail that was set at the inter-
15 section of Broadway and Parmele Street."
16 A. Correct.
17 Q. "I utilized the available M3 officers working
18 that night," and you list the officers. Here we have the
19 officers assigned: "Officers Campbell/Welsh and Officers
20 Jury/Lange were in the stop cars. Officer Kiely was the
21 undercover van."
22 A. Correct.
23 Q. And Officers Lochner and Kubik were the
24 undercover officers.

41

1 A. Correct.
2 Q. So you were working as just overall supervisor in
3 an additional stop car according to this?
4 A. Correct.
5 Q. Then the fourth paragraph in, we talked about
6 that at some point you got contacted by Campbell and Welsh
7 saying they had the probable cause statement?
8 A. Correct.
9 Q. Would you receive one of those for like every
10 stop, whether it's a prostitution or something unrelated?
11 A. If there's an arrest made, yes.
12 Q. So when it's prostitution you don't just give
13 people like a notice to appear; it's a full-blown arrest?
14 A. Correct.
15 Q. And then it says, "The officers had taken Lund
16 into custody. I reviewed the PC statement and contacted
17 the officers to explain the circumstances and traffic
18 charges," correct?
19 A. Correct.
20 Q. Was there something unusual about the probable
21 cause statement that made you contact them?
22 A. No.
23 Q. Then the next paragraph: "Probable cause
24 statement is attached to the complaint. As I read it, I

42

1  believe that Mr. Lund was potentially placing the
2  undercover officers in harm's way by drawing attention to
3  their location," correct?
4  A. Correct.
5  Q. "It was not known what Mr. Lund was doing when he
6  was photographing or videotaping the officers with the rise
7  in social media," correct?
8  A. Correct.
9  Q. What do you mean by that?
10 A. Well, I mean, you can start posting things right
11 away now with your phones; and I'm not sure if that's what
12 he was doing or not.
13      The issue I had was we had officers out there;
14 and as soon as you post things -- similar to the reason I'm
15 sure they went quiet with the radio. As soon as you post
16 things, people start showing up, even if it's people that
17 just -- not just stalkers but people that might want to
18 harm your officers.
19      So I'm not sure what his game plan was at the
20 time; but if he was directed to leave the area by my guys,
21 then he should have.
22 Q. Is there anything illegal to post on social media
23 photographs of police officers if they're in the public
24 way?

43

1  A. No.
2  Q. And I'm assuming you've worked details where the
3  secrecy of the detail becomes compromised or people found
4  out? Has that happened before?
5  A. No, not that I -- I mean, it very well could
6  have. I can't say that it has, not when I was working
7  them.
8  Q. But you don't know if somehow word got out that
9  they're running some sting and word got around to people.
10 A. No.
11 Q. But did you notice anything that night that made
12 it appear that Mr. Lund impeded this investigation?
13 A. Only based on what they were explaining to me
14 over the phone.
15 Q. Do you recall how many individuals were arrested
16 that night?
17 A. I think it was eight or nine.
18 Q. And is that an average number, small number,
19 large number?
20 A. I couldn't tell you. I mean, there's a wide
21 range every time you go out or every time we did go out.
22 Q. Well, is there one night you happen to recall
23 that happened to be just a really big night where you
24 arrested 20 people?

44

1  A. When we were doing call-backs at the hotels,
2  yeah.
3  Q. What do you mean by "call-backs at the hotel"?
4  A. Well, things are going social media again. So
5  after a while we started realizing a bunch of our
6  prostitutes were not on the street anymore, so one of the
7  genius guys were able to go online and see that they were
8  posting.
9  Q. Like the Backpage stuff?
10 A. Backpage, and there was -- can I reach out and
11 ask?
12 Q. It's not that important.
13 A. Well, there was another Web site that they could
14 get on and see that there was people in the community
15 saying, hey, if you go to a Web site these girls will have
16 you call out or call in and you can come over to a hotel
17 and meet them there.
18 Q. So I guess when they wise up not to do it on the
19 street corners, they would --
20 A. They're still doing it. But, yeah, a couple
21 times out of the way, especially when it got colder, the
22 girls started disappearing and that's where we'd find them.
23 Q. But this detail wasn't to target the girls; it's
24 actually to target the johns, though, correct?

45

1  A. Initially we'd go out and target -- we'd clear
2  the block by either putting guys in unmarked cars and
3  trying to stop the girls or have them flag them down, and
4  then we'd come back through with the guys later and drop
5  our girls off.
6  Q. Gotcha. But your concern here was that maybe
7  Mr. Lund could post this instantly to Twitter or something
8  and then your cover is blown.
9  A. Immediate.
10 Q. But that in and of itself is not illegal.
11 A. No.
12 Q. But it obviously frustrates you when you're
13 trying to run this operation?
14 A. It's not a frustration. It's just that we got
15 girls out there and their safety is paramount. So if
16 you're out there flagging -- or not flagging but taking
17 photos and videotaping, I don't know what you're doing with
18 them.
19 Q. Have you had situations where the girls have been
20 placed in danger or have had --
21 A. No.
22 Q. So I'm assuming if people know it's a sting,
23 there's going to be cops all over the place.
24 A. Maybe they do, maybe they don't.

46

1  Q. And then the next paragraph here you state that
2  "I authorized the charges against Mr. Lund including the
3  traffic charges," correct?
4  A. Correct.
5  Q. Are you required to authorize the charges?
6  A. Yes. If I don't sign off on it, it won't go -- I
7  mean, another supervisor could do it, but it's my detail
8  so...
9  Q. So if you didn't authorize, they could submit it
10 to another supervisor that could authorize it?
11 A. They could.
12 Q. Once it's authorized, is that when it's turned
13 over to the state's attorney to determine if they're going
14 to prosecute?
15 A. Through the chain, yeah, through the channels.
16 Q. Do you know those channels?
17 A. Well, the channel is they write it, I look it
18 over, review it, sign it, the squadrol goes to the jail and
19 prints it out, attaches it to whatever paperwork over at
20 the jail, and then the jail submits it to the State's
21 Attorney's Office.
22 Q. And then it's whether the state's attorney
23 determines to pick it up to prosecute or not?
24 A. Correct.

47

1  Q. In your arrests do you have any involvement in
2  that process?
3  A. Repeat that, please.
4  Q. Sure. Let's say it's your arrest, you're the
5  arresting officer, you do your probable cause statement,
6  submit your report, they go to the jail and then it gets to
7  the State's Attorney's Office.
8     Do they ever consult with you and say, "Hey,
9  Detective Torrance, we got your report. We're thinking of
10 maybe not prosecuting it"?
11 A. It's rare that they ever do that. At one point
12 we had -- they were calling over talking to another
13 supervisor in the morning, and then that supervisor would
14 say, hey, just so you know -- or she'd send out an email
15 that, hey, they're not doing these charges or they're
16 declining to charge this guy or something like that. We
17 don't always get that. Actually, again, it's super-rare
18 when that ever happens.
19 Q. So is it fair that once you submit your report
20 there in Winnebago County that you don't have much
21 involvement unless you're subpoenaed to testify?
22 A. Correct.
23 Q. And I think I asked earlier, but sometimes the
24 state's attorney will send you a letter to tell you the

48

1  outcome of your case and sometime they don't?
2  A. I never got a letter from them saying anything.
3  Q. Well, do you ever keep track of like your arrests
4  and the conviction rate?
5  A. No.
6  Q. Do you know if that's done within the department
7  itself?
8  A. I couldn't tell you if it was.
9  Q. So after I guess you submitted it looks like this
10 report on April 24th, 2016, that's when you had your
11 interview with Lieutenant Watton?
12 A. I believe the interview would have been after.
13 Q. Do you know who was present for that interview
14 besides Lieutenant Watton and yourself?
15 A. Maybe Lieutenant Ross. I'm not positive.
16 Q. Okay. And I'm assuming they would ask you
17 follow-up questions based on your officer's report?
18 A. That's correct.
19 Q. Do you know how long that -- do you recall how
20 long that was?
21 A. No, I don't.
22 Q. Do you know if those are transcribed or recorded?
23 A. I don't recall.
24 Q. So after you did I guess your interview, was your

49

1  next notification the findings?
2  A. Yes, I believe it was.
3  Q. And is that when you got like a one-page letter
4  saying, hey, some of these allegations were sustained
5  against you?
6  A. That's correct.
7  Q. Did you also have that verbal reprimand?
8  A. I think mine might have been a written reprimand.
9  Q. And did you have to counsel with anyone or talk
10 with anyone as a result of it?
11 A. Well, when Watton provided it to me, he just gave
12 it to me and told me what it meant; and of course I wasn't
13 happy about it, but my union attorney said not to -- you
14 know, don't say anything.
15 Q. Do you know why you didn't grieve it or challenge
16 it?
17 A. I don't think it was grievable because it was
18 just a written.
19 Q. Obviously what was sustained against you are
20 serious allegations. It's a violation of constitutional
21 rights, correct?
22 A. Yup.
23 Q. And then again we're not making this an exhibit,
24 but I want to put in front of you here the Internal Affairs

**Page 50**

1 file completed by Lieutenant Watton. Have you seen this
2 prior to today?
3    A. You know, I don't recall seeing this. I think I
4 just got that one findings paper. I don't think they're
5 going to release this to us.
6    Q. Okay. So you weren't released the entire
7 investigation, just the findings?
8    A. I don't recall seeing this. Just the findings.
9    Q. If we go to Bates stamp Officers 3646 and it's
10 Page 86, are you there?
11    A. Yes.
12    Q. And again I'm just going to read through the
13 findings here of this report.
14       MR. IASPARRO: Same objections, Counsel, with
15 respect to Lieutenant Watton's findings that they're
16 irrelevant.
17 BY MR. MEYER:
18    Q. And again we have here Allegation 1. The
19 allegation that Sergeant Eddie Torrance violated William
20 Lund's First Amendment constitutional right is sustained;
21 is that correct?
22    A. That's correct.
23    Q. Do you know if that's based upon the fact that
24 you authorized the arrest?

**Page 51**

1    A. He didn't say.
2    Q. Because obviously you weren't the one that was
3 there and took him into custody.
4    A. Right.
5    Q. But as you sit here, do you think it's because
6 you gave the okay or the thumbs-up to this arrest?
7    A. Yes, I believe so.
8    Q. Okay. Allegation 2 is the allegation that
9 Sergeant Eddie Torrance violated William Lund's Fourth
10 Amendment constitutional right is sustained; is that
11 correct?
12    A. That's correct.
13    Q. Do you know if that's in reference to the seizure
14 of his phone?
15    A. I can't tell you.
16    Q. And then Allegation 3, the allegation that
17 Sergeant Torrance violated William Lund's Fourteenth
18 Amendment constitutional right is also sustained; correct?
19    A. That's what it's saying, yes.
20    Q. And then we have Allegation 4, the allegation
21 that Sergeant Eddie Torrance caused damage to William
22 Lund's cell phone is unfounded.
23       And then there's like a little paren saying,
24 "Allegation 4 should be addressed to all officers in

**Page 52**

1 training, as cell phone batteries should be removed from
2 the cellular device prior to placing the cellular device
3 into property and evidence." Do you see that?
4    A. Yeah.
5    Q. Did you guys know that you should take these out?
6    A. I don't remember seeing this statement of taking
7 the batteries out of phones, no.
8    Q. Allegation 5, the allegation that Sergeant Eddie
9 Torrance caused damage to William Lund's gas-powered
10 motorcycle is unfounded.
11       I don't think I asked you this, but did you ever
12 see it on-scene?
13    A. Yeah, you asked. And, no, I didn't.
14    Q. Was it already towed by the time you got over
15 there?
16    A. I never went over there.
17    Q. So approval of all this stuff you just did via
18 the phone calls?
19    A. Yes.
20    Q. Then we have Allegation 6, the allegation that
21 Sergeant Eddie Torrance authorized arrest of William Lund
22 for obstructing a peace officer is sustained. And we saw
23 from your report that you approved the arrest, correct?
24    A. I did.

**Page 53**

1    Q. And then Allegation 7, the allegation that
2 Sergeant Torrance wrongfully authorized the arrest of
3 William Lund for driving after revocation is unfounded;
4 correct?
5    A. Correct.
6    Q. And then if we go to the next page, I think it is
7 the same duties and rules that we've covered before; but
8 this is what Lieutenant Watton claims were the rules and
9 regulations of the department that you violated. Is that a
10 fair statement?
11    A. That's a fair statement.
12    Q. And it looks like you had some different duties.
13 Was that because of your position as a supervisor at the
14 time, if we look at those four duties in the middle?
15    A. That's correct.
16    Q. So that's just you as a supervisor should not
17 have handled the situation -- or he's just saying you
18 handled the situation improperly?
19    A. That's his claim, correct.
20    Q. And did you ever dispute that with Lieutenant
21 Watton?
22    A. Nope, I did not.
23    Q. He just gave it to you and said, "Here's our
24 findings"?

**Page 54**

1  A. Yes.
2  Q. After that have you talked to anyone in the
3  department regarding these findings and your beliefs about
4  them?
5  A. I'm sure I did. I just don't know who I spoke
6  to.
7  Q. And have you ever requested your personnel file?
8  A. No, I did not.
9  Q. You never have?
10 A. Nope.
11 Q. So I'm assuming you never requested anything to
12 be taken out of it?
13 A. Nope.
14 Q. I asked that because there was -- have you ever
15 looked at your personnel file?
16 A. I have not.
17 Q. There's a bunch of pages that are redacted and I
18 couldn't see any reference to what was redacted in there.
19     MR. IASPARRO: Well, then they wouldn't be
20 redacted, Counsel.
21     MR. MEYER: No. I'm just saying there's no
22 reference to what was redacted and the basis for the
23 redaction. That's what I'm getting at.
24     MR. IASPARRO: I'd have to look at the context.

**Page 55**

1  I can tell you that most, if not all, of the redactions in
2  personnel files were just personal identifier information.
3     MR. MEYER: His was the only one that had
4  multiple pages redacted.
5     MR. IASPARRO: I'd have to go back and look at
6  it.
7     MR. MEYER: Just for the record, it's -- if we go
8  to the Bates stamps of the personnel file, it's Officers
9  891. Starting at 892 to 899 are redacted. And then it's
10 211 of 704, but the Bates stamp is Bates stamped Officers
11 909 to Officers 964.
12 BY MR. MEYER:
13 Q. So I'm just asking, you don't recall ever
14 requesting anything be removed from your file?
15 A. No.
16     MR. IASPARRO: I can tell you that was something
17 that we did in terms of --
18     MR. MEYER: I just didn't see it noted anywhere
19 what the basis of the redaction was.
20     MR. IASPARRO: And I will get you more
21 information about the general basis for the redaction, but
22 that was an exercise conducted by our office in terms of
23 producing discovery.
24     MR. MEYER: And the reason I ask -- and I don't

**Page 56**

1  want to -- we can off the record real quick here.
2       (Discussion off the record.)
3  BY MR. MEYER:
4  Q. I don't know if I asked you this. Prior to this
5  case do you recall any other Internal Affairs investigation
6  that you were the subject of besides the one we talked
7  about when you went down to detective from being sergeant?
8  A. I don't recall. I don't recall.
9  Q. Do you recall any type of investigation where
10 they were saying you covered up for a police officer who
11 was intoxicated at a Wendy's?
12 A. I'm sorry?
13 Q. Does that sound familiar?
14 A. Did I cover for a police officer?
15 Q. That you were accused of -- that a Rockford
16 police officer went to the Wendy's drive-through and was
17 drunk and like the police came and you were one of them and
18 you --
19 A. Okay. It's not a Rockford police officer. It
20 was a Metro Enforcement security guard. Actually, I don't
21 even know if he was Metro -- he may have been Metro
22 Enforcement. And, no, I didn't cover for him.
23     I was directed to leave from where I was, which
24 was on the west side of town, to go and stand by while our

**Page 57**

1  traffic investigator conducted field sobriety on him. And
2  that was a direction by a lieutenant who didn't want to
3  show any impropriety, so he sent two sergeants over there.
4  Q. So the Metro guy was just pissed that it happened
5  and filed a complaint against you?
6  A. I don't recall actually having a complaint filed
7  against me, but I was probably listed on it because I was
8  there.
9  Q. Okay. Got it. So the only ones that really
10 stand out to you obviously would be this one with Mr. Lund
11 and then that other one with the co-worker, correct?
12 A. Correct.
13 Q. Okay. Now, as you sit here today, is there
14 anything different that you would have done that day
15 regarding the interaction with Mr. Lund?
16 A. I probably would have went back and reviewed some
17 of the case law. I know after this whole thing and the
18 investigative of Mr. Lund went out, they started sending
19 out training bulletins through our PowerDMS is what it's
20 called; and I hate to say it, but it had my name written
21 all over it because it strictly referenced this type of
22 case.
23 Q. Oh, they sent out something after this in case
24 you encounter someone filming police?

58

1 A. Department-wide. So, yeah, after me or after our
2 case went through, excuse me, all of a sudden there's a
3 training bulletin that goes out on PowerDMS that we have to
4 look at.
5 Q. And what's PowerDMS?
6 A. It's a city-wide document-holder, I guess. They
7 stored multiple documents in there as well as different
8 training things, and it can document the date that you went
9 in and looked at it.
10 Q. Okay. So what specifically was in this training
11 program?
12 A. The same thing about citizens or people out
13 video-recording, is it illegal for them to do that; and it
14 was just like two or three paragraphs, maybe two
15 paragraphs.
16 Q. Do you remember anyone like citing the case Glik
17 vs. Cunniffe?
18 A. How do you spell the first one?
19 Q. G-l-i-k?
20 A. Yes. That's what Lieutenant Watton documented.
21 Q. And you knew that was a case decided in 2011,
22 correct?
23 A. I don't know when it was decided.
24 Q. Did Lieutenant Watton ever tell you, "Hey, we

59

1 already sent this out in a case update"?
2 A. He did not.
3 Q. When you receive those case law updates, do you
4 save those?
5 A. No. If it's in PowerDMS, it's always in PowerDMS
6 and you can get to it.
7 Q. So if you had to see if that case was circulated
8 to officers prior to May 25th of 2015, you could look in
9 the PowerDMS?
10 A. No, no. PowerDMS is probably two years old
11 maybe, three years old now. I think they were going
12 backwards to try to put those things in there, but I can't
13 say.
14 Q. Okay. So I guess after Lieutenant Watton came
15 and told you of the allegations that were sustained, up
16 until you got served with the lawsuit, did you talk with
17 anyone else about this incident?
18 A. Prior to the lawsuit I probably just spoke about
19 some disdain, you know, just issues about it; but I don't
20 recall who I would have spoke to.
21 Q. That you were like upset about the outcome of the
22 investigation?
23 A. Correct.
24 Q. So do you think that it should have been illegal

60

1 for Mr. Lund to photograph you guys?
2 MR. IASPARRO: Object to the form of the
3 question, if you can answer it.
4 A. No. I mean, it's already settled in a court of
5 law that it's not illegal for him to do that.
6 BY MR. MEYER:
7 Q. And to retaliate against him for doing that would
8 also be illegal.
9 A. Yes, it would be.
10 MR. MEYER: I think that's all I have.
11 MR. IASPARRO: I have a few follow-up questions,
12 Detective Torrance.
13
14      EXAMINATION
15      BY MR. IASPARRO:
16 Q. Based on the facts and the totality of the
17 circumstances as was described to you by Officer Welsh,
18 were you comfortable that there was probable cause to
19 arrest Mr. Lund that evening for obstruction of your
20 investigation?
21 A. I do.
22 Q. And can you explain that a little more? Was this
23 just a situation where he was simply taking photographs and
24 nothing more?

61

1 A. No. It appeared from what Welsh had told me that
2 he was riding around, you know, taking and videotaping and
3 specifically videotaping our girls and not our cars. My
4 fear was that he was going to post those girls online right
5 away and that somebody would come out and harm them.
6 Q. Do you have an understanding in talking to
7 Officer Welsh that Officer Welsh understood that Mr. Lund
8 was affiliated with the organization known as Rockford
9 Scanner?
10 A. I'm sorry. Can you repeat that?
11 Q. Sure. Did Officer Welsh explain to you that he
12 knew Mr. Lund to be affiliated with the organization known
13 as Rockford Scanner?
14 A. No.
15 Q. Did you know that prior to that evening?
16 A. I did not know it.
17 Q. Did you have an understanding that Mr. Lund was
18 aware that the two females that he was photographing and
19 videotaping were, in fact, undercover police officers?
20 A. Yes.
21 Q. And did Officer Welsh explain to you that after
22 confronting Mr. Lund and explaining to him that he needed
23 to leave the area that he then loudly said "Goodbye,
24 Officers" and gestured, waving to the two female officers

62
1 as he did so?
2   A. Yes.
3   Q. Did that also factor into your analysis in
4 approving the arrest of Mr. Lund that evening?
5   A. Yes, it did.
6   Q. And was your approval of Mr. Lund's arrest that
7 evening based upon the totality of those circumstances and
8 not simply the fact that Mr. Lund was taking photographs in
9 a public way?
10   A. That is correct.
11       MR. IASPARRO: That's all I have.
12       MR. MEYER: Just a follow-up with that.
13
14                EXAMINATION
15            BY MR. MEYER:
16   Q. To yell out "Goodbye, Officers," even though
17 they're undercover, that's not a crime.
18   A. Not a crime.
19   Q. Not a crime to film?
20   A. It's not a crime to film.
21   Q. And it's not a crime to be out in the public way
22 if you're not trespassing?
23   A. That's correct.
24   Q. And those are all the things that Mr. Lund was

63
1 doing.
2   A. Partially, yes.
3   Q. But when you say you combine all those
4 non-illegal things together, that gives rise to probable
5 cause for a crime?
6   A. Yes, the totality of the circumstances.
7   Q. And viewing the undercover officers alone, can
8 you tell they're police officers?
9   A. No.
10   Q. So you don't know whether or not Mr. Lund knew
11 they were police officers at the time he started to film
12 them.
13   A. No, I don't know what he thought.
14   Q. And whether or not he thought he was just out
15 there filming prostitutes or . . .
16   A. Well, if he says "Goodbye, Officers" and he's
17 waving at them specifically, then I believe he thought they
18 were police officers.
19   Q. After probably -- he did that after he was
20 approached by Officers Campbell and Welsh and they said,
21 "Hey, we're running a detail. Get out of here."
22   A. That's when he left.
23   Q. That may have let him know that these are
24 probably police officers.

64
1   A. Yes.
2   Q. And you didn't hear him yell "Goodbye, Officers,"
3 correct?
4   A. No.
5   Q. How far away were you from the scene on your
6 traffic stop?
7   A. I think I was at Arbor Court and 15th Avenue.
8   Q. And did you ever hear like the sound of a small
9 engine buzzing around when you were out?
10   A. No.
11       MR. MEYER: I don't have anything further.
12       MR. IASPARRO: Nothing further. We'll reserve.
13            (The deposition was concluded
14             at 3:20 p.m.)

1 S I G N A T U R E

4      I, Detective Eddie Torrance, hereby certify that I
5 have read the transcript of my sworn testimony given at the
6 time and place aforesaid, consisting of Pages 1 through 66,
7 inclusive.  With the exception of any and all corrections
8 or changes listed on a supplemental page, to the best of my
9 knowledge and belief, said testimony is true and accurate.

11 RE:   William Lund vs. City of Rockford, et al.
       Case No. 17-cv-50035

       Deposition taken on January 26, 2018

15                    _____
16                                   Signature

19 _____
20      Date

C E R T I F I C A T E

      I, THERESE A. WASILEWSKI, Registered Professional Reporter and Certified Realtime Reporter, in and for the County of Winnebago and the State of Illinois, do hereby certify that Detective Eddie Torrance on January 26, 2018, was by me first duly sworn; that signature was not waived; and that the foregoing is a true and correct transcript of my shorthand notes so taken as aforesaid.

      I FURTHER CERTIFY that I am not counsel for nor related to any of the parties herein nor am I interested, financially or otherwise, in the outcome hereof.

      I FURTHER CERTIFY that my certificate annexed hereto applies only to the signed and certified transcripts. I assume no responsibility for the accuracy of any reproduced copies not made under my control or direction.

      Dated and signed at Rockford, Illinois, on February 14, 2018.

*[Signature: Therese Wasilewski]*

Therese A. Wasilewski, RPR, CRR
Certified Shorthand Reporter
Illinois License No. 084-001784

Elite Reporting Services, Ltd.
815.229.8787